# jackson lewis.

Representing Management Exclusively in Workplace Law and Related Litigation

Jackson Lewis P.C.
666 Third Avenue
New York, New York 10017
Tel 212 545-4000
Fax 212 972-3213
www.jacksonlewis.com

| | | | |
|---|---|---|---|
| ALBANY, NY | GREENVILLE, SC | MONMOUTH COUNTY, NJ | RALEIGH, NC |
| ALBUQUERQUE, NM | HARTFORD, CT | MORRISTOWN, NJ | RAPID CITY, SD |
| ATLANTA, GA | HONOLULU, HI* | NEW ORLEANS, LA | RICHMOND, VA |
| AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | SACRAMENTO, CA |
| BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SALT LAKE CITY, UT |
| BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAN DIEGO, CA |
| BOSTON, MA | KANSAS CITY REGION | ORANGE COUNTY, CA | SAN FRANCISCO, CA |
| CHICAGO, IL | LAS VEGAS, NV | ORLANDO, FL | SAN JUAN, PR |
| CINCINNATI, OH | LONG ISLAND, NY | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | LOS ANGELES, CA | PHOENIX, AZ | ST. LOUIS, MO |
| DALLAS, TX | MADISON, WI | PITTSBURGH, PA | TAMPA, FL |
| DAYTON, OH | MEMPHIS, TN | PORTLAND, OR | WASHINGTON, DC REGION |
| DENVER, CO | MIAMI, FL | PORTSMOUTH, NH | WHITE PLAINS, NY |
| DETROIT, MI | MILWAUKEE, WI | PROVIDENCE, RI | |
| GRAND RAPIDS, MI | MINNEAPOLIS, MN | | |

*through an affiliation with Jackson Lewis P.C., a Law Corporation

MY DIRECT DIAL IS: (212) 545-4054
MY EMAIL ADDRESS IS: SNYDERJ@JACKSONLEWIS.COM

November 6, 2017

**VIA ECF**
Honorable Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

> Re:   **Johnston v. Electrum Partners, LLC et al.**
>         **Case No. 1:17-cv-7823 (KPF)**

Dear Judge Failla:

We represent Defendants Electrum Partners, LLC ("Electrum") and Leslie Bocskor ("Bocskor") in the above-referenced matter.   We write in accordance with Your Honor's Individual Rules of Practice to Request a Pre-Motion Conference.   Defendants seek leave to move the Court for an Order dismissing the instant action pursuant to Fed. R. Civ. P. 12(b), or alternatively, staying the action pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA").   The bases for the anticipated motion are that: (1) Plaintiff was never employed by Electrum Partners, LLC, she was the president of Cloud 12 Group, Inc. ("Cloud 12") with whom Electrum engaged as an independent contractor for certain business services; (2) Plaintiff, on behalf of Cloud 12, signed a valid and enforceable arbitration agreement in consideration for the Independent Contractor Agreement; and (2) Plaintiff's claims fall within the scope of the arbitration provision; and (3) Defendants have already initiated arbitration proceedings in Las Vegas, Nevada.

On January 4, 2016, Electrum entered into an Independent Contractor Agreement with Cloud 12 (the "Agreement").   See Exhibit 1 to JAMS Arbitration Demand, attached hereto. Plaintiff signed the Agreement in her capacity as Cloud 12's President.   The Agreement contained the following arbitration provision:

**jackson|lewis.**

Hon. Katherine Polk Failla
November 6, 2017
Page 2

> Except as otherwise provided in this Agreement, any and all
> controversies or claims arising out of or related to this Agreement
> or the breach thereof shall be settled by binding arbitration in Las
> Vegas, Nevada in accordance with the rules of the Judicial
> Arbitration and Mediation Service (JAMS), and judgment upon the
> award rendered may be entered in any court having jurisdiction.
>     . . .

Id. at ¶ 23.

Pursuant to the Agreement, Cloud 12 agreed to perform certain tasks as an independent contractor for Electrum generally related to brand development, marketing, and communications. Because, upon information and belief, Plaintiff is Cloud 12's sole employee, she performed Cloud 12's services to Electrum in her capacity as Cloud 12's President. She was never employed by Electrum nor performed any services for Electrum outside of the Agreement. On August 5, 2017, Electrum notified Cloud 12 that the Agreement would be terminated in 60 days, as required by Paragraph 8 of the Agreement. Cloud 12 abandoned the Agreement on August 25, 2017 and refused to perform further thereunder.

Thereafter, Plaintiff filed suit in the U.S. District Court, Southern District of Nevada, alleging that she was an employee of Electrum, and that Defendants had violated the New York City Human Rights Law ("NYCHRL") by terminating her. Defendants vehemently deny Plaintiff's claims. On November 3, 2017, Defendants, pursuant to the Paragraph 23 of the Agreement initiated proceedings with JAMS in Las Vegas and caused an arbitration demand to be served upon Plaintiff and Cloud 12. A copy of the JAMS Arbitration Demand is attached hereto as Exhibit A, and the claims are detailed in Exhibit 1 thereto.

The FAA governs arbitration provisions contained in agreements. See Circuit City Stores v. Adams, 532 U.S. 105, 113-116 (2001). A court must dismiss or stay a judicial action or proceeding if it is satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the action or proceeding. See Ipcon Collections LLC v. Costco Wholesale Corp., 698 F.3d 58, 62 (2d Cir. 2013); 9 U.S.C. § 3; Oldroyd v. Elmira Sav. Bank, 134 F.3d 72, 75-76 (2d Cir. 1998) (identifying steps in determining whether a judicial action must be stayed pending arbitration); Nunez v. Citibank, N.A., 2009 U.S. Dist. LEXIS 7783 (S.D.N.Y. Feb. 3, 2009), (citing Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1361 (2d Cir. 1993)) (holding that a broad arbitration clause creates a presumption of arbitrability).

The arbitration provision in the Agreement that Plaintiff signed is valid and enforceable under well-settled contract law principles. See Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 845 (2d. Cir. 1987) ("Under general contract principles a party is bound by the provisions of a contract that he signs"); Gold v. Deutsche Aktiengesellschaft, 365 F.3d 144, 149 (2d Cir. 2004) ("[I]n the absence of fraud or other wrongful act on the part of another contracting party, a party who signs or accepts a written contract is conclusively presumed to know its contents and to

**jackson‖lewis.**

assent to them.")).   The fact that Plaintiff did not sign the Agreement in her individual capacity does not alter the conclusion that her claims are subject to arbitration.  CBF Industria de Gusa S/A v. AMCI Holdings, Inc., 846 F.3d 35, 54-55 (2d Cir. 2017) ("This Court has previously held that 'a nonsignatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency.'"); Cont'l U.K. Ltd. v. Anagel Confidence Compania Naviera, S.A., 658 F.Supp. 809, 812 (S.D.N.Y. 1987) "("It may be proven that the non-signatory is an alter ego of the corporation" which signed the arbitration provision, "or that the signatory was acting in an agency capacity for the nonsignatory."); see, e.g., E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc., No. 97-CV-7102 (LAK), 1998 WL 314767, at *3 (S.D.N.Y. June 15, 1998) ("[A] nonsignatory to an agreement containing an arbitration clause may be compelled to arbitrate with a signatory where the nonsignatory knowingly accepts benefits derived directly from the agreement.").

Further, there can be no dispute that Plaintiff agreed to arbitrate the NYCHRL claims asserted in the Complaint. "When parties use expansive language in drafting an arbitration clause, presumably they intend all issues that 'touch matters' within the main agreement to be arbitrated." Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc., 252 F.3d 218, 225 (2d Cir. 2001) (citing Genesco, Inc., 815 F.2d at 846; see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."). Where all of the Plaintiff's claims are arbitrable, the court may dismiss the action. See Salim Oleochemicals v. M/V Shropshire, 278 F.3d 90, 91-93 (2d Cir. 2002) (discussing trial court's ability to stay proceedings or dismiss the case in favor of arbitration); Calamonaci v. Lasership Inc., No. 15-CV-3402 (KBF), (July 29, 2015) (unpublished) at p.4, n.2 ("This Complaint is alternatively dismissed because the parties agreed to arbitrate their claims.  This dispute falls within the broad arbitration clause in the Agreement and Congress has recognized that arbitration is to be encouraged in order to reduce the costs and delays associated with litigation."); Polit v. Global Foods Int'l Corp., 14-cv-7360 (JPO), 2015 U.S. Dist. LEXIS 51686 (S.D.N.Y. Apr. 20, 2015) (dismissing complaint without prejudice as all issues raised in Plaintiff's complaint were subject to arbitration); Drakeford v. Washington Mut., 07 Civ. 3489 (GBD), 2008 U.S. Dist. LEXIS 53224, at *4 (S.D.N.Y. July 11, 2008) ("Since this Court finds that all of plaintiff's claims against [defendant] are subject to arbitration, all claims against [defendant] are dismissed without prejudice.")

Courts in this District consistently hold that employment claims, including NYCHRL claims, are arbitrable and may be compelled to arbitration.  See, e.g., Reynolds v. de Silva, 09 Civ. 9218 (CM), 2010 U.S. Dist. LEXIS 18040, at *5 (S.D.N.Y. Feb. 24, 2010) (collecting cases); Mahe v. Tzell Travel, LLC, 2017 U.S. Dist. LEXIS 88488, at *8 (S.D.N.Y. June 8, 2017); See Lawrence v. Sol G. Atlas Realty Co., 841 F.3d 81, 83 (2d Cir. 2016) ("Claims under Section 1981, Title VII, the NYSHRL, the FLSA, and NYLL may be made subject to arbitration."). Plaintiff has unquestionably entered into a valid, enforceable written agreement to arbitrate the very same claims she purports to bring before this Court. See Murray v. UBS Securities, 12 Civ. 5914 (KPF), 2014 U.S Dist. LEXIS 9696 (S.D.N.Y. 2014) (where this Court

**jackson lewis.**

Hon. Katherine Polk Failla
November 6, 2017
Page 4

granted defendants' motion to compel arbitration of a former employee's Dodd-Frank Wall
Street Reform and Consumer Protection Act claims).

We appreciate the Court's consideration of this request.

Very truly yours,

JACKSON LEWIS P.C.

John A. Snyder

cc:   John T. Brennan, Esq. (via ECF)

4813-8020-2323, v. 1

# EXHIBIT A

# EXHIBIT A

# EXHIBIT A

# Demand for Arbitration Form
## Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

📞 1-800-352-JAMS
🖥 www.jamsadr.com

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Initial non-refundable filing fee**
- *For two-party matters, the filing fee is $1,200. For matters involving three or more parties, the filing fee is $2,000. The entire filing fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 12% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness.*

- *A refund of $600 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

**TO RESPONDENT** (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)     Add more respondents on page 6.

| | |
|---|---|
| **RESPONDENT NAME** | Cloud 12 Group, Inc. |
| **ADDRESS** | 23 W 73rd Street |
| **CITY** New York | **STATE** NY   **ZIP** 10023 |
| **PHONE** ██████ **FAX** | **EMAIL** ████████ |

**RESPONDENT'S REPRESENTATIVE OR ATTORNEY** (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | John T. Brennan, Esq. |
| **FIRM/COMPANY** | The Law Office of John T. Brennan |
| **ADDRESS** | 151 East 4th Street, No. 1-A |
| **CITY** Brooklyn | **STATE** NY   **ZIP** 11218 |
| **PHONE** (347)785-3005 **FAX** | **EMAIL** lawoffjtb@gmail.com |

## FROM CLAIMANT     Add more claimants on page 7.

| | |
|---|---|
| **CLAIMANT NAME** | Electrum Partners, LLC |
| **ADDRESS** | 3571 East Sunset Road, #300 |
| **CITY** Las Vegas | **STATE** NV   **ZIP** 89120 |
| **PHONE** ██████ **FAX** | **EMAIL** ████████ |

**CLAIMANT'S REPRESENTATIVE OR ATTORNEY** (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Joshua A. Sliker, Esq. |
| **FIRM/COMPANY** | Jackson Lewis P.C. |
| **ADDRESS** | 3800 Howard Hughes Pkwy, #600 |
| **CITY** Las Vegas | **STATE** NV   **ZIP** 89169 |
| **PHONE** (702)921-2486 **FAX** (702)921-2461 | **EMAIL** joshua.sliker@jacksonlewis.com |



# Demand for Arbitration Form (continued)

### Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐   If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

**CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION. A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.**

Please see Complaint attached hereto.

**AMOUNT IN CONTROVERSY (US DOLLARS)**     **At least $250,000.00**



# Demand for Arbitration Form (continued)
### Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach <u>two copies</u> of entire agreement.*

**ARBITRATION PROVISION LOCATION**

The provision is located in Paragraph 23.

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with <u>two copies</u> to JAMS.*

## REQUEST FOR HEARING

**REQUESTED LOCATION**   Las Vegas, Nevada

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)
*See: Comprehensive Rule 16.1*

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

| SIGNATURE | | DATE | 11/03/2017 |
|---|---|---|---|
| NAME (PRINT/TYPED) | Joshua A. Sliker, Esq. | | |



# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

**Completion of this section is <u>required for all consumer or employment claims</u>.**

## CONSUMER AND EMPLOYMENT ARBITRATION
Please indicate if this is a CONSUMER ARBITRATION. For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

    ☐ <u>YES</u>, this is a CONSUMER ARBITRATION.

    ☑ <u>NO</u>, this is not a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

    1.   The contract is with a consumer party, as defined in these standards;
    2.   The contract was drafted by or on behalf of the non-consumer party; and
    3.   The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

    1.   An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
    2.   An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
    3.   An individual with a medical malpractice claim that is subject to the arbitration agreement; or
    4.   An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

In addition, JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.

If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION, Respondent should communicate this objection in writing to the JAMS Case Manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration.

## EMPLOYMENT MATTERS
If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

    ☐ Less than $100,000      ☐ $100,000 to $250,000      ☑ More than $250,000      ☐ Decline to State

## WAIVER OF ARBITRATION FEES
In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

**RESPONDENT #2** (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| | |
|---|---|
| RESPONDENT NAME | Pamela Johnston |
| ADDRESS | 23 W 73rd Street |

| CITY | New York | STATE | NY | ZIP | 10023 |
|---|---|---|---|---|---|

| PHONE | ██████ | FAX | | EMAIL | ██████ |
|---|---|---|---|---|---|

**RESPONDENT'S REPRESENTATIVE OR ATTORNEY** (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | John T. Brennan, Esq. |
| FIRM/COMPANY | The Law Office of John T. Brennan |
| ADDRESS | 151 East 4th Street, No. 1-A |

| CITY | Brooklyn | STATE | New York | ZIP | 11218 |
|---|---|---|---|---|---|

| PHONE | (347)785-3005 | FAX | | EMAIL | lawoffjtb@gmail.com |
|---|---|---|---|---|---|

**RESPONDENT #3** (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| | |
|---|---|
| RESPONDENT NAME | |
| ADDRESS | |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|

**RESPONDENT'S REPRESENTATIVE OR ATTORNEY** (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | |
| FIRM/COMPANY | |
| ADDRESS | |

| CITY | | STATE | | ZIP | |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | |
|---|---|---|---|---|---|



# Demand for Arbitration Form (continued)
### Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| | |
|---|---|
| **CLAIMANT NAME** | Leslie Bocskor |
| **ADDRESS** | 1900 Waldman Avenue |
| **CITY** Las Vegas | **STATE** NV   **ZIP** 89102 |
| **PHONE** ▮▮▮▮▮  **FAX** | **EMAIL** ▮▮▮▮▮▮▮ |

**CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)**

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Joshua A. Sliker, Esq. |
| **FIRM/COMPANY** | Jackson Lewis P.C. |
| **ADDRESS** | 3800 Howard Hughes Pkwy, #600 |
| **CITY** Las Vegas | **STATE** NV   **ZIP** 89169 |
| **PHONE** (702)921-2486  **FAX** (702)921-2461  **EMAIL** joshua.sliker@jacksonlewis.com |

## CLAIMANT #3

| | |
|---|---|
| **CLAIMANT NAME** | |
| **ADDRESS** | |
| **CITY** | **STATE**   **ZIP** |
| **PHONE**  **FAX** | **EMAIL** |

**CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)**

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | |
| **FIRM/COMPANY** | |
| **ADDRESS** | |
| **CITY** | **STATE**   **ZIP** |
| **PHONE**  **FAX** | **EMAIL** |

1   DEVERIE J. CHRISTENSEN, ESQ.
    Nevada Bar No. 6596
2   JOSHUA A. SLIKER, ESQ.
    Nevada Bar No. 12493
3   **JACKSON LEWIS P.C.**
4   3800 Howard Hughes Parkway, Ste. 600
    Las Vegas, Nevada 89169
5   E-Mail: deverie.christensen@jacksonlewis.com
    E-Mail: joshua.sliker@jacksonlewis.com
6   Telephone: (702) 921-2460
7   Facsimile: (702) 921-2461

8   *Attorneys for Plaintiff*

**JAMS**

**LAS VEGAS, NEVADA**

| | |
|---|---|
| 10 | |
| 11 | ELECTRUM PARTNERS, LLC, a Nevada limited liability company; and LESLIE BOCSKOR, an individual, |
| 12 | |
| 13 | Plaintiffs, |
| 14 | v. |
| 15 | CLOUD 12 GROUP, INC., a New Jersey corporation; PAMELA JOHNSTON, an individual, DOES I through X, inclusive; and ROE ENTITIES I through X, inclusive, |
| 16 | |
| 17 | |
| 18 | Defendants. |

JAMS Case No.:

**COMPLAINT**

19   COMES NOW Plaintiffs ELECTRUM PARTNERS, LLC and LESLIE BOCSKOR, by

20   and through counsel DEVERIE J. CHRISTENSEN, ESQ. and JOSHUA A. SLIKER, ESQ., and

21   hereby complains and alleges the following:

**THE PARTIES**

22   1.   Plaintiff ELECTRUM PARTNERS, LLC (hereinafter "Electrum") is a limited

23

24   liability company organized and existing pursuant to the laws of the State of Nevada with its

25   principal place of business located in Las Vegas, Nevada.

26   2.   Plaintiff LESLIE BOCSKOR (hereinafter "Bocsor") is a citizen and resident of

27   the State of Nevada, and the President and Managing Member of Electrum.

28

3.     Defendant CLOUD 12 GROUP, INC. (hereinafter "Cloud 12") is a corporation organized and existing pursuant to the laws of the State of New Jersey with its principal place of business located in New York, New York.

4.     Defendant PAMELA JOHNSTON (hereinafter "Johnson") is a citizen and resident of the State of New York, and the President of Cloud 12.

5.     Defendant Cloud 12, as a fictional business entity, can only operate by and through its agents, directors, officers, managers, supervisors, and employees. Therefore, wherever the identifying word Defendant is used in relationship to Defendant, it encompasses actions by and through its agents, directors, officers, managers, supervisors, and employees.

6.     The true names and capacities of Defendants DOES I through X and ROE ENTITIES I through X, inclusive, are unknown at this time and may be individuals, sole proprietorships, associations, unincorporated associations, partnerships, limited liability companies, corporations, subsidiaries, owners, holding companies, predecessor or successor entities, joint ventures, parent corporations, or related business entities of the Defendants inclusive, or the administrators, affiliates, agents, attorneys, directors, insurers, officers, managers, representatives, supervisors, and/or employees of Defendants, that are responsible for their own conduct or the conduct of other Defendants.  Plaintiffs allege that each of the Defendants herein designated as a DOE and/or ROE Defendant is responsible in some manner for the events and happenings stated herein and thus, proximately caused injury and damages to Plaintiffs.  Plaintiffs further allege that Defendants were the agents, servants, masters, employees, or employers of one another, and were operating within the course and scope of their duties or otherwise established in another type of relationship that will support a finding of joint and several liability.  Plaintiffs will seek leave to insert true names and capacities for such DOE and ROE defendants when discovered.

### JURISDICTION AND VENUE

7.     The conduct and events described herein occurred within, concerned, and/or was directed toward the State of Nevada, and specifically toward Electrum and Bocskor in Las Vegas, Clark County, Nevada.

8.     The controversies, claims and allegations described herein all arise out of or are related to the Independent Contractor Agreement that Electrum entered into with Cloud 12 on January 4, 2016, and in which the parties agreed that any such disputes would be submitted to binding arbitration in Las Vegas, Nevada in accordance with the rules of the Judicial Arbitration and Mediation Services (JAMS).

## GENERAL ALLEGATIONS

9.     Electrum is an advisory services firm that specializes in providing strategic guidance to businesses in the medical and recreational sectors of the cannabis industry.

10.     Cloud 12 claims it is a "strategic consulting firm that specializes in complex problem solving, top line growth, and increased valuation."

11.     On January 4, 2016, Electrum entered into an Independent Contractor Agreement with Cloud 12 (the "Agreement").  See Independent Contractor Agreement, attached hereto as **Exhibit 1**, and incorporated by referenced herein.

12.     The Agreement was signed on behalf of Electrum by Bocskor, and on behalf of Cloud 12 by Johnston.

13.     Upon information and belief, Cloud 12 has no other owners, officers or employees other than Johnston.

14.     Pursuant to Paragraph 1 of the Agreement, Cloud 12 agreed to "work diligently and use his/her/its best efforts to perform, as an independent contractor, tasks to be assigned by" Electrum which included, but were not limited to, those enumerated in Attachment A to the Agreement (collectively, the "Services"):

     a. For Electrum Partners – reputation overall strategy and supervision for company, messaging, positioning, and participation;

     b. For Front Facing entities – events, conferences, speaking engagements, parties, social media platforms, web site, research, blog, content (photos, videos, company descriptions, bylined stories, other), handouts, image materials/signage, whitepapers, external communications (statements, gifts, disclosures, brags/eminence, issues management);

  c. Communication Strategies – internal, external, domestic, international, covert, press, analyst, policy, government, public;

  d. Competitive Positioning – company descriptions, service offerings, sponsorships, partnerships, promotions, deal input/due diligence, leadership projects/initiatives, social media strategy;

  e. Electrum Executive Reputation – bios, public speaking, press, images, social participation; and,

  f. Electrum Investment/Partner oversight – reputation, issues/crisis management, integrated marketing (digital marketing, sales & marketing, pr and content), business development, value plans and road maps).

See ¶ 1 of Agreement, Exhibit 1.

15. The Services were performed by Johnson on behalf of Cloud 12 in her capacity as Cloud 12's President.

16. In consideration for the Services performed by Cloud 12, Electrum agreed to pay Cloud 12 a fee of $8,500.00 per month for the term of the Agreement. See ¶ 2(a) of Agreement, Exhibit 1.

17. As additional consideration for the Agreement, Cloud 12 was provided with the opportunity to purchase a defined number of capital interests in accordance with the terms and conditions of Electrum's Equity Incentive Plan (EIP), at certain intervals and upon meeting certain conditions specified in the Agreement. See ¶ 2(b) of Agreement, Exhibit 1.

18. Electrum also agreed to reimburse Cloud 12 "for all pre-approved reasonable travel, room and board for performance of Services upon presentation of receipts for such expenses." See ¶ 2(c) of Agreement, Exhibit 1. However, Electrum's obligation to pay any such expenses was contingent upon the expenses being pre-approved by Electrum, reasonable in amount and nature, and supported by appropriate documentation that was to be submitted by Cloud 12 "no less frequently than once monthly on or before the 10th day of the month following the conclusion of the prior month." Id.

19.     Electrum and Cloud 12 agreed that Cloud 12 was performing the services as an independent contractor; that Cloud 12 would supply all equipment, tools, materials, and/or supplies necessary to perform the Services except as otherwise provided by the Agreement; that Cloud 12 was solely responsible for paying all taxes that may be due as a result of the payments made by Electrum to Cloud 12 pursuant to the Agreement; that Cloud 12 was responsible for obtaining any Workers' Compensation insurance; that Cloud 12 would maintain reasonable limits of general liability insurance; and that Cloud 12 had no authority to enter into contracts or agreements without the prior written consent of Electrum. See ¶¶ 3-6 of Agreement, Exhibit 1.

20.     Cloud 12 represented to Electrum that it had obtained all permits and licenses that it was required to hold under federal, state and/or local laws in order for it to render the Services. See ¶ 7 of Agreement, Exhibit 1.

21.     The term of the Agreement commenced on January 1, 2016 and was to end on December 31, 2018. See ¶ 8 of Agreement, Exhibit 1. However, Electrum or Cloud 12 could terminate the Agreement, for any reason or no reason at all, upon 60 days advance written notice to the other party. Id. Notwithstanding the foregoing, if the Agreement was terminated by either Electrum or Cloud 12 prior to December 31, 2018, Cloud would be entitled to receive only "those amounts earned through the date of [Cloud 12's] final performance of Services provided to [Electrum] and nothing more based on, if applicable, a pro rata portion of [Cloud 12's] Fee." Id.

22.     The Agreement required that Cloud 12 and its officers and employees, including Johnston, protect and maintain the confidentiality of Electrum's trade secrets and confidential information. See ¶ 9 of Agreement, Exhibit 1. Indeed, Cloud 12 and Johnston were expressly prohibited from directly or indirectly using, disclosing or disseminating to any other person, organization or entity or otherwise employing any of Electrum's trade secrets or confidential information for any purpose whatsoever. Id.; see also, ¶ 11 of Agreement.

23.     Following the execution of the Agreement, H.C. introduced members of Electrum to J.F., a prominent documentary filmmaker. J.F. expressed an interest in producing a documentary about Electrum and becoming a financial investor in the company. In April 2016, Johnston, executing Cloud's Services under the Agreement, met with J.F. in New York City,

1    New York, to discuss the documentary and attend a gala event celebrating a documentary featuring
2    the head of state of a South American country.  During the gala, J.F. and the head of state met to
3    discuss the film in front of the attendees.  Despite the professional nature of their meeting,
4    Johnston unilaterally disclosed details about her sexual history to J.F.  Johnston also gave J.F. one
5    or two coffee bean(s) laced with cannabis and instructed him to consume it to combat fatigue.
6    Johnston did not tell J.F. that the coffee bean(s) contained cannabis which, upon consumption,
7    caused J.F. to suffer an adverse physical reaction.  Due to Johnston's unprofessional and disturbing
8    conduct on behalf of Cloud 12, J.F. subsequently complained to Electrum about Johnston's
9    behavior and ceased all further communication with Electrum.

10          24.    Electrum tasked Cloud 12 with handling Electrum's participation in the 2016
11   Arcview Las Vegas conference.  Johnson performed the work on behalf of Cloud 12.  The
12   conference is of such importance in the cannabis industry that Electrum spends tens of thousands
13   of dollars annually to sponsor the event and grow the Electrum brand.  During the course of the
14   work, Electrum received numerous complaints from Arcview staff about Johnston's conduct.
15   Arcview's experiences with Johnston were so negative that they asked Electrum to assign a
16   different point of contact.  As a result of Johnston's conduct, Electrum had to task another
17   contractor with handling the Arcview event and incurred over $5,000.00 in additional costs.

18          25.    In May 2016, Electrum participated in the SkyBridge Alternatives (SALT)
19   Conference that was taking place in Las Vegas, Nevada.  Electrum tasked two contractors,
20   including Cloud 12, to manage Electrum's participation in the conference.  In order to conduct
21   meetings, Electrum reserved a hotel suite at the Bellagio Resort & Casino.  Electrum authorized
22   only two individuals to be present in the suite during non-working hours—Johnston, who was
23   performing the services on behalf of Cloud 12, and another contractor, S.S. Both were permitted
24   to sleep overnight in the suite.  Despite the business use of the suite and Electrum's instructions
25   about occupancy, Johnston invited a male companion to stay with her in the suite. The male was
26   not affiliated with nor authorized by Electrum to be in the suite.  While in the suite, he and
27   Johnston engaged in sexual acts, and both walked throughout the suite during business hours while
28   wearing an open bathrobe and naked underneath.  Johnston bragged to other people who visited

1  the suite for business purposes that S probably heard her and her companion "having sex all night."

2  This caused distress to S.S. and damaged Electrum's relationship with S.S.

3        26.      During the SALT conference, Bocskor, in his capacity as President of Electrum,

4  attended an invitation-only event. Johnson and Cloud 12 had not been invited. Undeterred,

5  Johnston intentionally bypassed security measures and entered the event. She was soon discovered

6  and removed from the event. As a result of Johnston's conduct, event security threatened to ban

7  Electrum from the conference.

8        27.      In July 2016, Johnston, on behalf of Cloud 12, was tasked with working with

9  Electrum's client, Company A. After a number of interactions with Johnston, Company A

10  contacted Electrum and terminated its business relationship with Electrum due to Johnston's poor

11  communication and work style. As a direct and proximate result of Johnston's conduct, Company

12  A did not renew their contract with Electrum resulting in a loss to Electrum of at least $250,000 in

13  revenue and equity.

14        28.      In light of Johnston's conduct, Electrum retained D.K., a prominent human

15  resources professional, to conduct a two-day intensive meeting with Cloud 12 and Johnston, to

16  address Electrum's concerns. The meeting resulted in Cloud 12 and Johnston agreeing to change

17  their behavior and stop damaging Electrum's brand and business relationships.

18        29.      In November 2016, Electrum was retained by Company B to create a marketing

19  plan. The cash and equity deal was worth at least $450,000.00 to Electrum. Because Cloud 12

20  represented that it had expertise in marketing, Electrum tasked Cloud 12 to begin creating the

21  marketing plan. Cloud 12's services were performed by Johnston. Johnston presented ideas to

22  Company B, but Company B pushed back against their viability. In response, Johnston

23  encouraged Bocskor to terminate Electrum's agreement with Company B, and told Bocskor on

24  several occasions that Company B was making her cry. Johnston had exhibited similar behavior

25  on prior occasions when her ideas or quality of work were challenged by clients and other

26  individuals. Based on Johnston's repeated insistence to Bocskor to terminate Electrum's

27  agreement with Company B and Electrum's belief, at the time, that Cloud 12 and Johnston were

28  making the recommendation because they believed it was in Electrum's best interests, Electrum

1   terminated the Company B agreement on or about February 3, 2017. As a result, Electrum lost

2   $140,000.00 in revenue that remained on the Company B agreement, and approximately

3   $300,000.00 in equity.

4          30.     Subsequently, Electrum learned that Cloud 12 had, in violation of the Agreement,

5   outsourced the majority of the work Johnston performed on the Company B marketing plan to

6   third party contractors. In further violation of the Agreement, Cloud 12 billed Electrum for the

7   costs associated with the outsourcing and did so in a manner that obfuscated the true nature of the

8   expenses. Approximately $70,000.00.00 in outsourcing costs were wrongfully and fraudulently

9   billed to Electrum by Cloud 12. Electrum reimbursed Cloud 12 for the expenses before it

10   discovered what Cloud 12 and Johnston had done.

11          31.     Johnston, on behalf of Cloud 12, also interacted with M.B. during the time that

12   Cloud 12 performed services for Electrum. M.B.'s company (Company C) is a significant investor

13   in Electrum and a vendor for several of Electrum's clients and Electrum occasionally dealt with

14   M.B. in that professional capacity. Johnston took to using a nickname for M.B. during their

15   communications which M.B. found derogatory and repeatedly asked her to stop using. Johnston

16   refused to stop. As a result, M.B. and two of Electrum's clients refused to interact with Johnston.

17   Johnston's actions damaged Electrum's brand and business relationships.

18          32.     In May 2017, Johnston began claiming that Electrum owed Cloud 12 certain sums

19   under the Agreement, and repeatedly communicated demands to Electrum for payment.

20   Johnston's demands exceeded the bounds of reasonableness and quickly escalated into threatening

21   conduct. In conjunction with these collection efforts, Johnston began accusing Bocskor of wanting

22   to kill her and wanting her to die. She repeated these false and defamatory statements to third-

23   parties on at least two occasions.

24          33.     On or about May 19, 2017, Johnston was traveling by car with N.G., the Chief

25   Executive Officer of Company D which had a business relationship with Electrum, from

26   Washington, D.C. During the trip, Johnston, in violation of the Agreement, disclosed confidential

27   information about Electrum's finances including the nature and amount of investments made in the

28

company. Electrum did not authorize Cloud 12 or Johnston to disclose any trade secrets or confidential information to N.G.

34.     Also during the trip with N.G., Johnston stated that Electrum did not have sufficient prospects to advance in the cannabis industry, and that Bocskor was an ineffective manager whose personal and professional habits and practices were flawed, and were preventing Electrum from succeeding.

35.     On or about June 20, 2017, Johnston contacted J.B., the Chief Executive Officer of Company E, an Electrum client. In violation of the Agreement, Johnston disclosed confidential information about Electrum's financial condition and the nature of the work Cloud 12 was performing for Electrum's other clients. Electrum did not authorize Cloud 12 or Johnston to disclose any trade secrets or confidential information to J.B.

36.     In July 2017, Electrum tasked Cloud 12 to organize a press conference and handle other marketing-related tasks for Company F, one of Electrum's clients. Cloud 12 assigned Johnston to perform the services. On the day of the press conference, neither Johnston nor anyone else from Cloud 12 attended the press conference, or notified Electrum or Company F that they would not be attending. Company F was humiliated and embarrassed in front of the members of the press that had convened for the event. Cloud 12's and Johnston's conduct led to the breakdown of the relationship between Electrum and Company F such that the Company F ceased making payments to Electrum for services rendered. Upon information and belief, Cloud 12 and Johnston in violation of the Agreement, are attempting to induce Company F, Electrum's client, to terminate its relationship with Electrum and instead use Cloud 12 for its advisory needs.

37.     Subsequently, Electrum learned that Cloud 12 had, in violation of the Agreement, outsourced some of the marketing work that Cloud 12/Johnston was to perform for Company F to third party contractors. In further violation of the Agreement, Cloud 12 billed Electrum for the costs associated with the outsourcing and did so in a manner that obfuscated the true nature of the expenses. At least $15,000.00 in outsourcing costs were wrongfully and fraudulently billed to Electrum by Cloud 12. Electrum reimbursed Cloud 12 for the expenses before it discovered what

Cloud 12 and Johnston had done.  Electrum believes that Cloud 12 and Johnston have engaged in similar wrongful and fraudulent conduct with respect to other tasks assigned to Cloud 12.

38.     During the course of Cloud 12 business relationship with Electrum, Johnston stated to Bocskor that she is the devil and that if anyone crosses her, she will use the media to destroy that person.

39.     After numerous complaints from clients, vendors, contractors, and others regarding the quality of work produced and the behavior of Cloud 12 and Johnston, its President, and Cloud 12 and Johnston's wrongful and fraudulent conduct in violation of the Agreement, Electrum notified Cloud 12 on August 5, 2017 that the Agreement would be terminated in 60 days, as required by the Agreement.  However, Cloud 12 abandoned the Agreement on August 25, 2017 and refused to perform further thereunder.

40.     Following the notice of termination of the Agreement, Electrum began reviewing all expenses and billings submitted by Cloud 12 and Johnston to Electrum for payment.  While the review is ongoing, Electrum has determined that at least $10,000.00 of improper expenses and billings were submitted by Cloud 12 and Johnston.  Electrum reimbursed Cloud 12 and/or paid the billings prior to discovering their wrongful and fraudulent nature. Electrum anticipates that additional improper expenses and billings will be discovered as the review continues.

41.     Since early August 2017, Electrum has received numerous reports from clients, friends, and investors, that Johnston, both individually and in her capacity as President of Cloud 12, has made false and defamatory statements about Electrum and Bocskor, that Electrum was "falling apart", and that Bocskor wants her to die.

42.     On or about August 20, 2017, Johnston contacted D.D. and told D.D. that Cloud 12's contract with Electrum had been terminated, that her family was encouraging her to sue Electrum, that Bocskor was no longer communicating with her, and that Bocskor wanted to kill her and that Bocskor wants her to die.

43.     Between September 5th and 12, 2017, Johnston contacted G.K., an Electrum investor, and told him that she was going to sue Bocskor because Bocskor wanted her to die, and that Bocskor did not call her enough to check on her.

44.     On or about October 11, 2017, Johnston filed suit in the U.S. District Court, Southern District of New York, Case No. 1:17-cv-07823-KPF, and named Electrum and Bocskor as defendants. Therein, Johnston falsely claimed that she was an employee of Electrum, and that she was fired for reporting sexual misconduct by Electrum employees to Electrum, and for having Stage 4 breast cancer.

45.     On October 12, Johnston conducted an interview with the *NY Post*, a publication with over 400,000 readers, and made false and defamatory statements that Electrum and Bocskor fired her for "reporting numerous office affairs and tattling on a woman who refused to wear underwear" and because she has Stage 4 breast cancer. Johnson also stated that Bocskor "chose to kick her to the curb because he didn't want to deal with her cancer diagnosis or the alleged misconduct that she reported." Further, Johnston disclosed that she has "instructed my executor of the will — it's in writing — to continue this if I die," revealing that her motive for filing the suit is not to seek redress for a legal claim, but an act of malice to harass, defame, and intimidate Electrum and Bocskor.

46.     On October 18, 2017, Cloud 12 and Johnston created or assisted in the creation of a publicly available website on the fundraising platform, gofundme, located at https://www.gofundme.com/teampammy. Therein, Cloud 12 and/or Johnston, or those acting on their behalf or direction, made false and defamatory statements that Johnston was wrongfully terminated from Electrum, that she was fired for disclosing that she had Stage 4 breast cancer, that the termination is a death sentence for Johnston, and that Electrum has caused Johnston to lose her residence. As of the date of this Complaint, 170 people had viewed the page and made financial donations. The page also links to Johnston's interviews with news outlets including Forbes, the *NY Post*, *New Cannabis Venture*, and *Marijuana Business Daily*, which constitutes a republication of Johnston's false and defamatory statements made therein.

47.     On or about October 20, 2017, Johnston gave an interview to *Inc.com*. During the interview, she falsely stated that after she disclosed her cancer diagnosis to Bocskor that he told her "that he would loan her money, obtain for her a hard-to-obtain cannabis-based oil that has been used in the treatment of cancer and generally would 'have her back' with respect to her day-to-day

1    responsibilities as an Electrum employee." Johnston then stated that the oil never arrived, her

2    payments began drying up until she was not being paid at all. Johnston's statements were false

3    and defamatory to Electrum and Bocskor.

4         48.    On or about October 31, 2017, Johnston was interviewed on the *Investing in*

5    *Cannabis* podcast about Electrum and Bocskor. Therein, she stated it was "obvious" and that she

6    was "quite confident" that Electrum terminated her for having cancer. She also stated that

7    Electrum "does not give a hoot" about her, her life, or her health. Johnston stated that her "lawyer

8    is of the belief that they [Electrum and Bocskor] want me to die." She went to urge listeners to

9    "imagine how it would feel believing that there are people that you know that actually want your

10   death accelerated." Johnston stated that Electrum had retaliated against her for reporting sexual

11   misconduct by terminating her employment. She stated that her goal in filing the lawsuit, is to

12   force Bocskor to go to therapy, to cause people to not do business with Bocskor, to obtain a public

13   and effusive apology from Bocskor, to force Electrum to hire her for Electrum's "crisis work in the

14   future for a lot of fricken money," for Bocskor to take care of Johnston's daughter, to have

15   Electrum and Bocskor spend money on research for cancers that cannot be cured by cannabis, and

16   to have Electrum and Bocskor engage in philanthropic efforts focus on the patient community and

17   not the cannabis community. Johnston went on to compare Electrum and Bocskor to Harvey

18   Weinstein and the myriad allegations of sexual misconduct that have been made against him.

19   Johnston claimed that there is conspiracy in the cannabis community to look the other way when

20   human rights violations are committed. These statements were false and defamatory. During the

21   interview, Johnston, in violation of the Agreement, also disclosed the names of four Electrum

22   clients that she, on behalf of Cloud 12, had worked with including Company F, Company G,

23   Company H and Company I. As of the date of this Complaint, the podcast has been published to at

24   least 379 people.

25        49.    The actions and/or omissions of Defendants were wilful, malicious, fraudulent,

26   oppressive and/or done in conscious disregard of the consequences that their actions and/or

27   omissions would have upon Plaintiffs and, in fact, Plaintiff did suffer such injury from the

28   Defendants' conduct in violation of N.R.S. 42.001 and 42.005.

**FIRST CAUSE OF ACTION**
**(Breach of Contract as to Cloud 12)**

50.     Plaintiff Electrum repeats and realleges the allegations contained in Paragraphs 1 through 49, inclusive, as though fully set forth herein.

51.     The Agreement constituted a valid and existing contract between Electrum and Cloud 12, and Electrum performed as agreed under the terms thereunder.

52.     Cloud 12 breached the Agreement by failing to work diligently and use its best efforts to perform the Services assigned to Cloud 12.

53.     Cloud 12 breached the Agreement by utilizing third-party contracts to perform work for Electrum and its clients without Electrum's authorization.

54.     Cloud 12 breached the Agreement when Johnston, Cloud 12's President, claimed that she was an employee of Electrum instead of an independent contractor as specified in the Agreement.

55.     Cloud 12 breached the Agreement when Johnston, its President, engaged in behavior and conduct that caused damaged to Electrum's brand and business relationships.

56.     Cloud 12 breached the Agreement when Johnston, its President, disclosed Electrum's trade secrets and confidential information to third parties without authorization.

57.     Cloud 12 breached the Agreement when it submitted improper billings and expenses to Electrum for payment and concealed the true nature of the same.

58.     As a direct and proximate result of Cloud 12's conduct, Electrum has sustained damages in excess of $10,000.00.

59.     Plaintiff has been required to retain legal counsel to prosecute this action, and is therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

**SECOND CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing as to Cloud 12)**

60.     Plaintiff Electrum repeats and realleges the allegations contained in Paragraphs 1 through 59, inclusive, as though fully set forth herein.

61.     Electrum entered into the Agreement with Cloud 12 whereby Cloud 12 agreed to perform the Services, and Electrum agreed to pay Cloud 12 a fee of $8,500.00 per month for those services.

62.     It was implicit in the parties' agreement that Cloud 12 owed a duty to deal with Electrum and perform its obligations under the Agreement in good faith.

63.     Cloud 12 has breached its duty of good faith and dealing by failing to use its best efforts to perform the Services, claiming that Johnston is an employee of Electrum and not an independent contractor, by engaging in conduct and behavior that damaged the brand and business relationships of Electrum, by submitting improper expenses and billings for payment by Electrum, and by revealing Electrum's trade secrets and confidential information to third parties without authorization.

64.     As a direct and proximate result of Cloud 12's breach, Electrum's justified expectations of completing its obligations under the Agreement and receiving certain services in consideration thereof have been denied, and Electrum has sustained damages in excess of $10,000.00.

65.     Plaintiff has been required to retain legal counsel to prosecute this action, and is therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

## THIRD CLAIM FOR RELIEF
### (Unjust Enrichment as to Cloud 12)

66.     Plaintiff Electrum repeats and realleges the allegations contained in Paragraphs 1 through 65, inclusive, as though fully set forth herein.

67.     Cloud 12 has unjustly retained the benefit of Electrum's payments for services that Cloud 12 did not use its diligence and best efforts to render, and for expenses and billings which were paid to Cloud 12 by Electrum and for which were improper.

68.     The principles of justice and/or equity and conscience mandate that Electrum is entitled to a monetary judgment sufficient to disgorge Cloud 12 of its unjustly retained benefits in an amount to be proven at the arbitration hearing.

69.    Plaintiff has been required to retain legal counsel to prosecute this action, and is therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

### FOURTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

70.    Plaintiff Electrum repeats and realleges the allegations contained in Paragraphs 1 through 69, inclusive, as though fully set forth herein.

71.    A confidential relationship existed between Electrum, and Cloud 12 and Johnston, its President.

72.    Electrum placed special trust and confidence in Cloud 12 and its President, Johnston, to provide Services to Electrum and its clients, and ensure that Electrum's relationships with its clients was not damaged as a result of the rendering of the services. Electrum also relied on Cloud 12 and Johnston, its President, for their advice and counsel on various business issues including marketing and overall communications strategy. As a result of the special trust and confidence, Defendants had access to Electrum's trade secrets and confidential information.

73.    Defendants breached that special trust and confidence by disclosing Electrum's confidential information to third parties without authorization, making false and defamatory statements about Plaintiffs, behaving in an outrageous and unprofessional manner that impaired and/or destroyed Electrum's relationships with business associates and clients, soliciting Electrum's clients to stop doing business with Electrum and instead do business with Defendants, and by obtaining payments from Electrum by submitting wrongful and fraudulent expenses and billings.

74.    As a direct and proximate result of Defendants' breach, Electrum's has sustained damages in excess of $10,000.00.

75.    Plaintiff Electrum has been required to retain legal counsel to prosecute this action, and is therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

### FIFTH CLAIM FOR RELIEF
### (Business Disparagement)

76.    Plaintiff Electrum repeats and realleges the allegations contained in Paragraphs 1 through 75, inclusive, as though fully set forth herein.

77.     Defendants have made false, disparaging and defamatory statements including, but not limited to, that Electrum wrongfully terminated Johnston for reporting sexual misconduct, that Electrum terminated Johnston because she has Stage 4 breast cancer, that the termination is a death sentence for Johnston, that Electrum has caused Johnston to lose her residence, that Electrum is falling apart, and that Electrum wants her death accelerated.

78.     Defendants' statements were made to media outlets, the public at large, and other third parties, and constituted unprivileged and unjustified publications.

79.     Defendants acted with malice in making the statements.

80.     As a direct and proximate cause of the wrongful and tortious conduct of the Defendants, Electrum has suffered, and will continue to suffer, among other things, compensatory loss of business income and loss of reputation.

81.     Plaintiff has been required to retain legal counsel to prosecute this action, and is therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

### SIXTH CLAIM FOR RELIEF
**(Defamation and Defamation Per Se)**

82.     Plaintiff Bocskor repeats and realleges the allegations contained in Paragraphs 1 through 81, inclusive, as though fully set forth herein.

83.     Defendants have made numerous false and defamatory statements that Bocskor wants to kill Johnston, that he wants Johnston to die, that Bocskor fired her for "reporting numerous office affairs and tattling on a woman who refused to wear underwear"; that Bocskor wrongfully terminated her for reporting sexual misconduct and for disclosing that she has Stage 4 breast cancer; that Bocskor "chose to kick her to the curb because he didn't want to deal with her cancer diagnosis or the alleged misconduct that she reported"; that the termination is a death sentence for Johnston; that Bocskor's personal and professional habits and practices are detrimental to the success of Electrum; and that Bocskor is like Harvey Weinstein (i.e., a sexual predator).

84.     Defendants' made an unprivileged and unjustified publication of these statements to media outlets, the public, and other third parties.  Jacobs v. Adelson, 325 P.3d 1282, 1286-87 (2014).

85.     Defendants were at least negligent when they made the statements, or alternatively, Defendants made the statements with malice.

86.     As a direct and proximate cause of the wrongful and tortious conduct of the Defendants, Bocskor has suffered, and will continue to suffer, among other things, loss of income, loss of business and professional opportunities, humiliation, embarrassment, loss of reputation, and emotional distress.

87.     Plaintiff has been required to retain legal counsel to prosecute this action, and is therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

## SEVENTH CLAIM FOR RELIEF
### (Invasion of Privacy – False Light)

88.     Plaintiff Bocskor repeats and realleges the allegations contained in Paragraphs 1 through 87, inclusive, as though fully set forth herein.

89.     Defendants have made numerous false statements that Bocskor wants to kill Johnston, that he wants Johnston to die, that Bocskor fired her for "reporting numerous office affairs and tattling on a woman who refused to wear underwear"; that Bocskor wrongfully terminated her for reporting sexual misconduct and for disclosing that she has Stage 4 breast cancer; that Bocskor "chose to kick her to the curb because he didn't want to deal with her cancer diagnosis or the alleged misconduct that she reported"; that the termination is a death sentence for Johnston; that Bocskor's personal and professional habits and practices are detrimental to the success of Electrum; and that Bocskor is like Harvey Weinstein (i.e., a sexual predator).

90.     The false light in which Defendants have portrayed Bocskor is highly offensive to Bocskor and would be so to any reasonable person.

91.     Defendants made these statements on internet social media outlets, in online postings, newspapers, and other media publications.

92.     Defendants had knowledge of and/or acted in reckless disregard, as to the falsity of the statements and false light that their conduct would and has placed Bocskor.

93.     As a direct and proximate cause of the wrongful and tortious conduct of the Defendants, Bocskor has experienced, and will continue to experience, among other things, emotional distress.

94.     Plaintiff has been required to retain legal counsel to prosecute this action, and is therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

### EIGHTH CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress)

95.     Plaintiff Bocskor repeats and realleges the allegations contained in Paragraphs 1 through 94, inclusive, as though fully set forth herein.

96.     At all times relevant, Defendants engaged in extreme and outrageous conduct knowing the effect it would have on Bocskor, his health, reputation and livelihood in the following ways, including, but not limited to:

a.   Defendants took advantage of the position of trust and confidence given to them by virtue of the independent contractor relationship with Electrum and using information gained therein to harm Bocskor;

b.   Defendants took advantage of the position of trust and confidence obtained by Johnston under the auspices of forming a friendship with Bocskor only for Johnston to later use that trust and confidence to emotionally blackmail Bocskor; and/or,

c.   Ascribing false conduct and statements to Bocskor including that he terminated Johnston because she reported sexual misconduct, that he terminated Johnston because she had cancer, that he wanted Johnston to die, that he wanted to kill Johnston, that he promised to provide Johnston with money and gifts, and then did not provide such items, and disseminating those statements to news publications and social media for the purpose of inflicting maximum pain, suffering and embarrassment upon Bocskor.

97.     At all times relevant, Defendants were recklessly indifferent to the likelihood that their actions would cause severe emotional distress to Bocskor, and will continue to cause such distress into the future.

98.     As a direct and proximate cause of the wrongful and tortious conduct of the Defendants, Bocskor has experienced, and will continue to experience, among other things, sleeplessness, anxiety, humiliation, embarrassment, loss of personal and business relationships, shaking, cold sweats, vomiting, stomach and chest pains, tension in his chest, headaches, sadness, and nightmares.

99.     Plaintiff has been required to retain legal counsel to prosecute this action, and is therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

### NINTH CLAIM FOR RELIEF
### (Abuse of Process)

100.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 99, inclusive, as though fully set forth herein.

101.     Johnston sued Plaintiffs in the *Johnston v. Electrum Partners, LLC, et al.* action based on an ulterior purpose other than to resolve a legal dispute.  Johnston publicly stated that her goal in filing the lawsuit, is to force Bocskor to go to therapy, to cause people to not do business with Bocskor, to obtain a public and effusive apology from Bocskor, to force Electrum to hire her for Electrum's "crisis work in the future for a lot of fricken money," for Bocskor to take care of Johnston's daughter, to have Electrum and Bocskor spend money on research for cancers that cannot be cured by cannabis, and to have Electrum and Bocskor engage in philanthropic efforts focus on the patient community and not the cannabis community.

102.     Defendant's willful act in use of process was not proper in the regular conduct of the proceeding.

103.     As a direct and proximate cause of the wrongful and tortious conduct of the Defendants, Bocskor has suffered, and will continue to suffer, among other things, loss of income, embarrassment, loss of reputation, emotional distress, and fees and costs flowing from Johnston's abuse of process.

104.     Plaintiff has been required to retain legal counsel to prosecute this action, and is therefore entitled to reasonable attorney's fees and costs of suit incurred in this action.

## TENTH CLAIM FOR RELIEF
### (Alter Ego)

105.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 104, inclusive, as though fully set forth herein.

106.     Cloud 12 is the alter ego of Johnston.

107.     Johnston is the sole owner, officer and employee of Cloud 12.

108.     Johnston as President of Cloud 12 influences and governs Cloud 12's affairs.

109.     There is a comingling of funds between Cloud 12 and Johnston.

110.     Cloud 12 does not have appropriate operating capital.

111.     Johnston has engaged in unauthorized diversions of funds from Cloud 12.

112.     Johnston treats the assets of Cloud 12 as if they were her own.

113.     Cloud 12 does not observe corporate formalities such as holding board meetings, and maintaining separate bank accounts.

114.     There is such unity of interest and ownership between Cloud 12 and Johnston that they are inseparable from one another.

115.     The facts are such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction a fraud and/or promote injustice.

## ELEVENTH CLAIM FOR RELIEF
### (Declaratory Judgment)

116.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 115, inclusive, as though fully set forth herein.

117.     Electrum contracted with Cloud 12 pursuant to the Agreement for Cloud 12 to provide the Services as an Independent Contractor.

118.     Cloud 12 had discretion on means and manner and time in which to perform the Services.

119.     Johnston is Cloud 12's President and only performed the Services on behalf of Cloud 12 in that capacity pursuant to the terms of the Agreement.

120.    Cloud 12 has an employer identification number and has filed an income tax return for business earnings from its work as an independent contractor in the previous year.

121.    Johnston has a social security number and has filed an income tax return for earnings from self-employment with the Internal Revenue Service in the previous year.

122.    Cloud 12 was required to obtain and hold any necessary federal, state, and/or local business licenses and/or registrations to enable it to provide the Services under the Agreement. Johnston was aware of and agreed to this in her capacity as Cloud 12's President.

123.    Cloud 12 was not required to render exclusive services to Electrum under the Agreement.

124.    Cloud 12 was free to hire employees to assist with providing the Services to Electrum.

125.    Pursuant to N.R.S. 608.0155, Cloud and Johnston, its President, are conclusively deemed independent contractors and not employees of Electrum.

126.    There exists a live and justiciable controversy as to whether Johnston was an employee of Electrum.

127.    Electrum and Johnston are adverse to each other.

128.    Electrum has a legal interest in the controversy because whether an individual is its employee or independent contractor imposes differing duties and obligations under the law upon Electrum.

129.    The issue is ripe for determination as Johnston has asserted she was an employee of Electrum.

WHEREFORE, Plaintiffs pray for judgment as follows:

1.  For general damages;

2.  For special damages;

3.  For pre-judgment and post-judgment interest;

4.  For punitive damages;

5.  For reasonable attorney fees;

6.  For costs of suit;

7. For declaratory relief; and

8. For such other and further relief as this Court may deem just and proper.

DATED this 3rd day of November, 2017.

JACKSON LEWIS P.C.

/s/ Joshua A. Sliker
DEVERIE J. CHRISTENSEN, ESQ.
Nevada Bar No. 6596
JOSHUA A. SLIKER, ESQ.
Nevada Bar No. 12493
3800 Howard Hughes Parkway, Ste. 600
Las Vegas, Nevada 89169
*Attorneys for Plaintiffs*

# EXHIBIT 1

# EXHIBIT 1

# EXHIBIT 1

## INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement ("Agreement") is hereby made and entered into this 4th day of January, 2016, by and between Electrum Partners, LLC. (hereinafter "Company"), and Cloud 12 Group Inc. ("Consultant"), a corporation, on the terms, conditions and provisions as follows:

### 1. SCOPE OF WORK

Company is contracting with Consultant to perform, and Consultant agrees to work diligently and use his/her/its best efforts to perform, as an independent contractor, tasks to be assigned by Company. While such assignments may change from time to time, the parties currently anticipate that the Consultant will perform the services as described in Attachment A to this Agreement and any other services reasonably agreed upon by Company and Consultant (the "Services"). Consultant will determine the means by and manner in which such Services shall be performed.

### 2. PAYMENT

Company shall pay Consultant as follows:

a.  Company will pay Consultant a fee of $8,500 per month for the Term of this Agreement.

b.  Upon execution of this Agreement by all parties and subject to the terms and conditions of the Company's Equity Incentive Plan (the "EIP"), Consultant shall be awarded the ability to vest options to purchase 3,575 capital interests at an exercise price of $109.19 per interest, which shall be exercisable only upon a "Corporate Change" (as defined in the EIP). Upon execution of this agreement, 550 capital interest will vest immediately. Thereafter, and subject to the Company's EIP, for each calendar quarter (three month period) during which Consultant performs Services for the Company, up to a maximum of eleven (11) calendar quarters during the Term of this Agreement, Consultant shall vest, at the end of each such calendar quarter, the option to purchase 275 capital interests at an exercise price of $109.19 per interest, which shall be exercisable only upon a "Corporate Change" (as defined in the EIP); provided, however, if this Agreement terminates during a calendar quarter when Consultant is eligible for an award as described in this sentence, the number of options to purchase capital interests awarded to Consultant for the calendar quarter shall be prorated based on the number of days Consultant performed services for the Company during the calendar quarter over the total number of days in the calendar quarter, rounded to the nearest whole number (all as determined by the Company). If there is any conflict between this Agreement and the EIP, the terms of the EIP will control.

c.  Company shall reimburse Consultant for all pre-approved reasonable travel, room and board for performance of Services upon presentation of receipts for such expenses. Consultant shall submit receipts no less frequently than once monthly on or before the 10th day of the month following the conclusion of the prior month. Company shall reimburse Consultant no less frequently than monthly for expenses submitted in a timely fashion and supported by proper receipts.

### 3. EQUIPMENT, TOOLS, MATERIALS AND SUPPLIES

Consultant shall supply all equipment, tools, materials, and/or supplies to accomplish the Services agreed to be performed except that: (a) Consultant may use Company's Nevada offices when necessary for him/her/its to interact with Company's employees; (b) Consultant may use Company's Business (as defined below in this Agreement) information and related databases when necessary for him/her/its to perform Services assigned under this Agreement; (c) Company will provide support required and cover expenses relating to contract management and billing for business Consultant brings to Company; (d) and Company will provide or reimburse for reasonable expenses related to managing paying customers brought in by Consultant (budgeting TBD).

### 4. PAYROLL TAXES

No state or federal taxes of any kind, no matter how enumerated or identified, shall be withheld or paid by Company on behalf of Consultant. Instead, since Consultant is an independent contractor, and he/she/it shall be solely responsible for any and all taxes of any kind that may be due and owing as a result of payments received under this Agreement.

### 5. THE COMPANY IS NOT RESPONSIBLE FOR INSURANCE

No Workers' Compensation insurance shall be obtained by Company on account of the Consultant. Instead, since Consultant is an independent contractor, he/she/It shall be solely and exclusively responsible for obtaining any necessary workers' compensation insurance. He/She/It shall present proper proof of such insurance upon reasonable request of Company. Consultant shall also carry reasonable general liability insurance, which amount and proof shall be agreed upon by Consultant and Company.

### 6. AUTHORITY TO BIND THE COMPANY/INDEPENDENT CONTRACTOR

Consultant has no authority to enter into contracts or agreements on behalf of Company or any of its predecessor, parent, subsidiary or affiliated corporations, without the prior written consent of Company (which can be provided electronically by Company). Rather, Consultant shall perform the Services as an independent contractor. Consultant is not a partner, employee or agent of Company.

### 7. PERMITS AND LICENSES

Consultant represents that he/she/it has complied with all federal, state and local laws regarding business permits and licenses that may be required to complete the work to be performed under this Agreement.

### 8. TERM AND TERMINATION

The term of this Agreement shall commence on January 1, 2016 (the "Commencement Date"), and shall end on December 31, 2018 (the "Term"). In addition to, and not by way of limitation, this Agreement may be terminated by either party to this Agreement, for any or no reason, upon sixty (60) days advance written notice. If either party terminates this Agreement prior to the end of the Term, Consultant shall be entitled to receive only those amounts earned through the date of Consultant's final performance of Services provided to Company and nothing more based on, if applicable, a pro rata portion of Consultant's Fee. Awards previously made under the Company's EIP shall continue in effect subject to the terms of the awards. If Consultant continues to perform Services after the end of the Term, the content of this Agreement shall renew on a month-to-month basis until such time as the parties enter into a new agreement or either party gives the other thirty (30) days advance written notice of the intent to terminate the Agreement. The parties may mutually agree to amend, append or replace this agreement with one another at any time.

## 9.  TRADE SECRETS, CONFIDENTIAL INFORMATION AND INVENTIONS

Consultant agrees that Company is engaged in a unique and highly competitive business of providing consulting services and products to public or pre-public companies exclusively in the cannabis industry, and which are collectively the "Business" of the Company: Business Creation (including but not limited to, business structuring, business and operational plan development, development of paths to capital formation and to investor liquidity); Business Incubation (including but not limited to, development of plans to improve operational efficiency, preparation of complete financial packages, c-suite level executive oversight, daily operational guidance, sales and marketing, formulation or and facilitation of government relations and regulatory compliance, development of strategic relationships, national and international distribution and franchising planning and execution); MMB License Application Package Development (including but not limited to, facilitation of licensure applications with governing bodies, navigation of regulatory frameworks and political environments, identification and pursuit of industry experts, investors, strategic industry operating partners, key employees, consulting physicians and other healthcare professionals, architects and contractors); Community and Environment Relations and Development (including but not limited to outreach and educational programs, security and waste management plans, and community and environmental impact plans).

Company's involvement in this industry has required and continues to require the expenditure of substantial amounts of money and the use of skills developed over a long period of time related to the Business of the Company.  As a result of these investments of money, skill and time, Company has developed and will continue to develop certain valuable trade secrets, confidential information and inventions that are peculiar to Company's business and the disclosure of which would cause Company great and irreparable harm.  Consultant acknowledges and agrees that, had he not entered into this Agreement, he would not have had the opportunity to work with and become privy to such information.

(a)     The term "Trade Secrets" means any scientific or technical information, design, process, procedure, formula or improvement that is valuable and not generally known to Company's competitors.  To the fullest extent consistent with the foregoing, Trade Secrets shall include, without limitation, all information and documentation, whether or not patented, copyrighted or trademarked, pertaining to the design, specifications, capacity, testing, installation, implementation and customizing techniques and procedures concerning Company's products and services.

(b)     The term "Confidential Information" means any data or information and documentation, other than Trade Secrets, which is valuable to Company and not generally known to the public, including but not limited to:

(i)     Product information, including but not limited to designs, specifications, modifications, advancements and discoveries;

(ii)     Financial information, including but not limited to earnings, assets, debts, prices, fee structures, volumes of purchases or sales, or other financial data, whether relating to Company generally, or to particular products, services, geographic areas, or time periods;

(iii)     Supply and service information, including but not limited to information concerning the goods and services used or purchased by Company, the names and addresses of suppliers, terms of supplier service contracts, or of particular transactions, or related information about potential suppliers, to the extent that such information is not generally known to the public, and to the extent that the combination of suppliers or use of particular suppliers, though generally known or available, yields advantages to Company the details of which are not generally known;

(iv)     Marketing information, including but not limited to details about ongoing or proposed marketing programs or agreements by or on behalf of Company, marketing forecasts, results of marketing efforts or information about impending transactions;

(v)     Personnel information, including but not limited to personal histories, compensation or other terms of employment, actual or proposed promotions, hiring, resignations, disciplinary actions, terminations or reasons therefore, training methods, performance or other employment information;

(vi)    Customer information, including but not limited to any compilations of past, existing or prospective customers, customer proposals or agreements between customers and Company, status of customer accounts or credit, or related information about actual or prospective customers; and

(vii)   Business information, including but not limited to business plans, minutes of board meetings, financial reports, strategic plans, operations manuals and best practices memoranda.

(c)     The term "Inventions" means any contribution, discovery, concept or idea, regardless of whether it is patented, copyrighted or protected as mask work, and regardless of whether it contains or constitutes Trade Secrets or Confidential Information, including but not limited to processes, methods, formulas and techniques, as well as improvements thereof.

## 10. ASSIGNMENT OF INVENTIONS

Consultant expressly agrees that with respect to any and all Trade Secrets, Confidential Information and other Inventions and works made or conceived by him while relating to the work that he performs for Company under the terms of this agreement, whether solely or jointly with any employee of Consultant or any other person or organization:

(a)     Consultant will disclose promptly to Company all such Trade Secrets, Confidential Information and other Inventions and works.  Also, the Consultant will submit a written report setting forth in detail the procedures and results achieved from any and all studies and research projects undertaken, whether or not a given project has resulted in the development of Trade Secrets, Confidential Information or other inventions and works.

(b)     Consultant will execute and promptly deliver to Company (at The Company's expense) such written instruments and do such other acts as may be required to patent, copyright or otherwise protect such Trade Secrets, Confidential Information and other Inventions and other Inventions and works, and any documentation or other materials pertaining thereto, and to vest the entire right and title thereof in Company.  All such Trade Secrets, Confidential Information and other Inventions and works, together with any documentation or other materials pertaining thereto, shall be considered work made for hire and prepared by Consultant within the scope of his Agreement with Company.

(c)     Company shall have the perpetual and unlimited right, without cost, to use in its business and to sublicense and assign, in whole or in part, any of such Trade Secrets, Confidential Information or other Inventions and works, and to make, use and sell any and all products, processes, research and services derived from any of such Trade Secrets, Confidential Information or other Inventions and works.  This includes, but is not limited to, using, making and selling products, processes and/or services derived from such Trade Secrets, Confidential Information and other Inventions and works.

(d)     This Paragraph does not apply to any Inventions or works exempted by this Agreement. Specifically, this Paragraph does not apply to any Inventions or works developed by Consultant:
(i)     Which Consultant did not use any equipment, supplies, facilities, Trade Secrets, Confidential Information or other proprietary information; and
(ii)    Which Consultant developed entirely on his own time outside his working hours with Company; and
(iii)   Which do not relate to the actual or anticipated research or development of Company, or which do not result from any work performed by Consultant for Company.

## 11. NON-DISCLOSURE OF

Page 4 of 8

## TRADE SECRETS AND CONFIDENTIAL INFORMATION

Consultant agrees, except as specifically required in the performance of the Services under this Agreement and with Company's express written permission, that he/she/it shall not so long thereafter as the pertinent information or documentation remains a Trade Secret or Confidential Information, directly or indirectly use, disclose or disseminate to any other person, organization or entity or otherwise employ any Trade Secret or Confidential Information for any purpose whatsoever. The obligations set forth herein shall not apply to any Trade Secrets or Confidential Information which shall have become generally known to competitors of Company through no act or omission of Consultant.

## 12. NON-SOLICITATION

In order to protect the Company's Business, including its Trade Secrets and Confidential Information, Consultant agrees that for **twelve (12) months** after this Agreement terminates, he/she/it will not directly or indirectly, either for Consultant's own account or for any third party, call on, solicit, induce to leave, take away, or in any way interfere with the Company's relationships (including but not limited to making any disparaging statement or communications about the Company and any of its affiliates or related entities) with any of the Company's customers, clients, investors, partners, suppliers, vendors, licensees, licensors, franchisees or other business relations with whom Consultant had contact while performing his/her/its Services under this Agreement, without the prior written consent of the Company, such consent to be within Company's sole and absolute discretion. For the purposes of this paragraph, "contact" means any interaction whatsoever between Consultant and the Company's customers, clients, investors, partners, suppliers, vendors, licensees, licensors, franchisees or other business relations.

## 13. WORK FOR HIRE

Consultant agrees that he will be required to create original works in the course of performing tasks under this Agreement. Consultant further agrees that all such works have been specially ordered or commissioned by Company, constitute a work made for hire within the meaning of the Copyright Act of the United States and that Company shall be considered to be the author of such works. Consultant further assigns, transfers and conveys to Company all rights, title and interest in any other works created by him during the term of this Agreement that are related to the tasks performed under this Agreement.

## 14. RETURN OF PROPERTY

Consultant agrees that he will deliver to Company upon the conclusion of this Agreement, and at any other time upon Company's request, all memoranda, notes, records, computer programs, computer files, drawings or other documentation, and all copies thereof, in his possession, custody or control, whether made or compiled by Consultant alone or with employees of Consultant, if any, or made available to him relating to the work performed under this Agreement. Consultant further agrees to sign a statement verifying that he has returned all such property.

### 15. NON-ASSERTION OF RIGHTS

Consultant does not and will not assert any rights to any inventions, discoveries, concepts or ideas, or improvements thereof or know-how related thereto, as having been made or acquired by Consultant prior to his Agreement with the Company, or since the date of this Agreement and not otherwise covered by the terms of this Agreement. Consultant represents that his performance of all the terms of this Agreement, as well as the performance of his duties as a Consultant of Company, does not and will not breach any agreement with any other entity to preserve the confidentiality of any information. Consultant further acknowledges that he has not entered into, and will not enter into, any agreement that would be in conflict with this Agreement. Consultant also acknowledges that he has delivered to Company a true and correct copy of any consulting, employment, non-competition, non-solicitation or confidentiality agreement, or related agreement, to which he/she/it is or was a party and which remains or may remain in effect as of the date of this Agreement.

### 16. NON-SOLICITATION OF EMPLOYEES

Consultant agrees that during the term of this Agreement and for **twelve (12) months** after this Agreement terminates, he/she/it will not directly or indirectly recruit, hire, attempt to recruit or hire any employee of Company with whom Consultant had contact while performing his duties under this Agreement. For the purposes of this paragraph, "contact" means any interaction whatsoever between Consultant and Company employees.

### 17. WAIVER OF BREACH

Company's waiver of a breach of any provision of this Agreement by Consultant does not waive any subsequent breach by Consultant, nor does Company's failure to take action against any other individual(s) or entity(-ies) for similar breaches operate as a waiver by Company of a breach.

### 18. COURT'S RIGHT TO MODIFY RESTRICTIONS

The parties have attempted to limit Consultant's activities only to the extent necessary to protect Company from unfair competition. The parties recognize, however, that reasonable people may differ in making such a determination. Consequently, the parties agree that, if the scope or enforceability of this Agreement is in any way disputed at any time, an arbitrator, court or other trier of fact may modify and enforce the Agreement to the extent it believes to be reasonable under the circumstances.

### 19. SEVERABILITY

If any provision in this Agreement is determined to be in violation of any law, rule or regulation or otherwise unenforceable, and cannot be modified to be enforceable, such determination shall not affect the validity of any other provision of this Agreement, but such other provisions shall remain in full force and effect. Each provision, paragraph and subparagraph of this Agreement is severable from every other provision, paragraph and subparagraph and constitutes a separate and distinct covenant.

### 20. SUCCESSORS

This Agreement shall be binding upon and insure to the benefit of Company and its successors and assigns. Company shall have the right to assign this Agreement to a successor to all or substantially all of the business or assets of Company or any division or part of Company. Consultant may not assign his duties under this Agreement without the written consent of Company.

### 21. INJUNCTIVE RELIEF

Consultant understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement Company shall suffer irreparable injury for which there is no adequate remedy at law. Company will therefore be entitled to injunctive relief from the courts, enjoining the Consultant from engaging in activities in breach of the Agreement. Consultant further acknowledges that Company also shall have the right to seek a remedy at law through arbitration as well as or in lieu of an injunction in the event of any such breach.

## 22.  CHOICE OF LAW

Consultant and Company agree that this Agreement shall be construed in accordance with and governed by the substantive and procedural laws of the State of Nevada, regardless of its conflict of laws provision.

## 23.  ARBITRATION

Except as otherwise provided in this Agreement, any and all controversies or claims arising out of or related to this Agreement or the breach thereof shall be settled by binding arbitration in Las Vegas, Nevada in accordance with the rules of the Judicial Arbitration and Mediation Service (JAMS), and judgment upon the award rendered may be entered in any court having jurisdiction. Company reserves the right to object to any individual arbitrator who is or was employed by or affiliated with a business entity providing the same or similar products and services as Company. At the request of either Company or Consultant, the arbitration proceedings will be conducted in secrecy; in such case, all documents, testimony and records will be received and maintained by the arbitrator in secrecy and under seal, available for inspection only by Company, Consultant and their respective attorneys and experts, who must first agree in writing to maintain such information as confidential. Nothing in this Paragraph shall prevent Company from seeking injunctive relief from the courts pending arbitration.

## 24.  ENTIRE AGREEMENT AND MODIFICATION

This Agreement constitutes the entire agreement and understanding between Company and Consultant concerning the subject matters contained herein. This Agreement supersedes any and all prior understandings and agreements between the parties concerning these subject matters. This Agreement may not be modified, terminated, waived altered or amended except in writing, signed by Consultant and a duly authorized officer of Company.

CLOUD 12 GROUP INC.                              ELECTRUM PARTNERS, LLC.


_____          _____

By: Pamela Johnston                              By: Leslie Bocskor
Title: President                                 Title: Managing Member

## ATTACHMENT A – the "Services"

Consultant shall provide the following services to Company throughout the Term of this Independent Contractor Agreement:

1. <u>Role</u>

   Consultant will fill the role of Director of Marketing for Company. This role will have responsibilities beyond that of Electrum Partners, extending to its subsidiaries (partially- or wholly-owned) and its clients and partners, as directed by Company management. The role is responsible for the management of the reputation and increasing the brand value of Electrum Partners.

2. <u>Duties & Responsibilities</u>

   <u>For Electrum Partners</u> -- Reputation Overall Strategy and Supervision (not all execution) – Company, Messaging, Positioning, Participation

   <u>For Front Facing entities</u> – Events, Conferences, Speaking Engagements, Parties, Social Media platforms, Web Site, Research, Blog, Content (Photos, Videos, Company Descriptions, Bylined Stories, Other), Handouts, Image Materials/Signage, Whitepapers, External Communications (Statements, Gifts, Disclosures, Brags/Eminence, Issues Management),

   <u>Communication Strategies</u> – Internal, External, Domestic, International, Covert, Press, Analyst, Policy, Government, Public

   <u>Competitive Positioning</u> – (Company Descriptions, Service Offerings, Sponsorships, Partnerships, Promotions, Deal Input/Due Diligence, Leadership Projects/Initiatives – Book 1), Social Media Strategy

   <u>Electrum Executive Reputation</u> – Bios, Public speaking, Press, Images, Social participation

   <u>Electrum Investment/Partner oversight</u> – Reputation, Issues/crisis management, Integrated Marketing (Digital marketing, Sales & Marketing, PR and Content), Business Development, Value Plans and Road Maps

3. <u>Expense Management</u> -  Company and Consultant will work together to determine a monthly budget for expenses required to manage Company business, and to fulfill the role, duties and responsibilities outlined above.

For clarification:

- Consultant may, from time-to-time, be required to initiate contracts with clients that will be managed exclusively by Consultant, or Consultant Contracts. However, in the interest of ensuring appropriate optics to the community, all of these types of accounts will be brought in under the "Electrum Partners" brand.

- In these instances, Company will provide reasonable resources to manage the contracts and billing for Consultant Contracts, and will bill Consultant for these services on a "Cost+15%" model.

- This means that Company will pass 85% of all fees collected through these types of accounts to Consultant.

- Consultant and Company shall review this arrangement as needed to ensure that the resources expended by Company to manage Consultant Contracts are covered by the fees being charged. If the Company is losing money, each party agrees to reevaluate the "Cost+" percentage to ensure that Company is covering actual expenses.

- Support – Unless agreed to otherwise in writing, Consultant will manage support expenses from the 85% fees that are passed through to Consultant by Company for Consultant Contracts.

- Expenses – Unless agreed to otherwise in writing, Consultant will manage expenses for Consultant Contracts from the 85% fees that are passed through to Consultant by Company for Consultant Contracts.