HCDKJOHC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

PAMELA JOHNSTON,

            Plaintiff,

        v.                              17 CV 4403 (KPF)

ELECTRUM PARTNERS LLC, et al.,

            Defendants.

------------------------------x
                                        New York, N.Y.
                                        December 13, 2017
                                        3:40 p.m.

Before:

                HON. KATHERINE POLK FAILLA,

                                        District Judge

                         APPEARANCES

JOHN T. BRENNAN
    Attorney for Plaintiff

JACKSON LEWIS LLP
    Attorneys for Defendants
BY: JOHN A. SNYDER II
```

1                (Case called)
2                MR. BRENNAN:  John Brennan, for the plaintiff.
3                THE COURT:  Sir, good afternoon.
4                MR. SNYDER:  John Snyder, Jackson Lewis, for Electrum
5     and Leslie Bocskor.
6                THE COURT:  Good afternoon to you as well.
7                This is our initial conference in this case, and this
8     is also a premotion conference in the case, based on
9     Mr. Snyder's letter.
10               Mr. Brennan, let me, please, begin with you, sir.
11    Your complaint noted -- and that's what I was working from
12    initially in this case -- that Ms. Johnston began her work or
13    was hired by defendants in June of 2016.  If you could just
14    perhaps reconcile that or provide a little bit more context
15    based on the information that I received from Mr. Snyder, which
16    suggested a prior independent contract relationship.
17               MR. BRENNAN:  There was a prior independent -- I'm
18    sorry.
19               THE COURT:  Just so I can see you, sir.
20               MR. BRENNAN:  I'm sorry.
21               THE COURT:  There's a monitor in front of you.
22               MR. BRENNAN:  There was a prior independent contractor
23    relationship, not with Ms. Johnston, with a company that she
24    operated.
25               THE COURT:  But a company for which she was the sole

1  and only person?
2       MR. BRENNAN:  Correct, your Honor.
3       THE COURT:  Okay.
4       MR. BRENNAN:  Yes.
5       THE COURT:  When they entered into that contract, I
6  assume they were getting her services as a representative of
7  that company?
8       MR. BRENNAN:  They were, yes.
9       And then as time went on -- that was in January of
10 2016 approximately -- as time went on, they brought her into
11 the company, they made her an executive vice president in
12 charge of communications and special programs, I believe the
13 title was.  They changed the way she was compensated; she
14 became an employee.
15      THE COURT:  And just so I understand, with this
16 original independent contractor agreement, was there a time
17 limit on it?  Was it for a term of months?  Or was it an
18 open-ended document?
19      MR. BRENNAN:  It was open-ended.
20      THE COURT:  It was open-ended?  And if you recall,
21 what was her compensation structure then, as an independent
22 contractor?
23      MR. BRENNAN:  Her compensation structure was --
24 structure for the company, Cloud12 -- was that it got $8,500 a
25 month, plus a piece of what business they brought in, plus

1    expenses as approved by Electrum.

2            THE COURT:  Was it promotional or marketing?  I saw
3    advisory services.  I guess I'd like to know what that means.

4            MR. BRENNAN:  It was basically public relations, your
5    Honor.  That's her specialty.

6            THE COURT:  Okay.  So, after a period of approximately
7    six months --

8            MR. BRENNAN:  They brought her inside, they changed
9    her duties, she became more in charge of things like accounting
10   for the place.  I don't mean that in a CPA kind of way --

11           THE COURT:  Okay.

12           MR. BRENNAN:  -- I mean dealing with expenses the
13   clients had; she became responsible for additional clients, is
14   my understanding; and her compensation changed.  And I believe
15   the defendants pointed out she was getting paid $8500 a month
16   following June of 2016, which would be a change in her
17   compensation.

18           THE COURT:  How so?  Because the expenses were
19   different?

20           MR. BRENNAN:  Well, she would still get the expenses,
21   but before, she had also been getting a piece of the business
22   she brought in.

23           THE COURT:  Then, if I may ask, that seems like a cut
24   for her because, or a decrease in what she could possibly
25   obtain.  You're saying, on either side June 2016, your client

1    was getting $8,500 a month in compensation?
2              MR. BRENNAN:  She was getting 85 -- she, Cloud12 was
3    getting compensation of 8500.
4              THE COURT:  I understand.
5              MR. BRENNAN:  Yes.  That was cash paid to her or cash
6    paid to Cloud12.
7              THE COURT:  Okay.  But --
8              MR. BRENNAN:  And on either side of June, that is
9    true.  Following June, she started getting an additional $3,000
10   a month.  That's not attributable to the Cloud12 contract, and
11   she continued to get a cut of business she had already brought
12   in when working under the independent contractor agreement.
13             THE COURT:  Okay.  Did she sign a written agreement
14   when she became an employee of the company, in or about June?
15             MR. BRENNAN:  Yes, she did, your Honor.
16             THE COURT:  Did the agreement recite that it
17   superseded any prior agreements that she might have entered
18   into?
19             MR. BRENNAN:  Excuse me.  I might have misunderstood
20   your question.
21             THE COURT:  That's okay.  I'll ask the question.
22             MR. BRENNAN:  Do you mean did she sign in June?
23             THE COURT:  I am saying in June.
24             MR. BRENNAN:  Okay.  No, she did not.
25             THE COURT:  When her position changed, the indicia of

1    that change, as you describe it, are, first of all, she got a
2    different title, yes?
3              MR. BRENNAN:  Yes.
4              THE COURT:  Maybe she got business cards?
5              MR. BRENNAN:  Yes.
6              THE COURT:  And they didn't say -- is it Cloud12?  I'm
7    sorry, what's the company again?
8              MR. BRENNAN:  Cloud12.
9              THE COURT:  Cloud12?
10             -- didn't say that anymore, it was Electrum Partners?
11             MR. BRENNAN:  Electrum, yes.
12             THE COURT:  And instead of the $8,500 a month, she got
13   $8,500 a month, plus 3,000 a month?
14             MR. BRENNAN:  Yes.
15             THE COURT:  So $11,500 a month?
16             MR. BRENNAN:  Yes.
17             THE COURT:  And there was an understanding that she
18   would obtain some additional monies for any business that she
19   had brought in prior to joining the company, yes?
20             MR. BRENNAN:  She continued to get the cut she got of
21   business she brought in when she was working Cloud12, yes.
22             THE COURT:  Sir, I want to ask the question
23   differently, please.  Excuse me.
24             I imagine your client would be concerned that she not
25   be in a worse position for having joined Electrum Partners than

1    having remained an independent contractor; would you agree with
2    me on that?
3              MR. BRENNAN:  Correct, your Honor.
4              THE COURT:  As a consequence of that, was there not
5    some written documentation of the new job responsibilities, new
6    offer, the company's perspective, with respect to any money she
7    may have been getting --
8              MR. BRENNAN:  To my knowledge -- go ahead.  I'm sorry.
9              THE COURT:  -- for pre-June 2016 work?
10             MR. BRENNAN:  To my knowledge, there was not, your
11   Honor.
12             THE COURT:  Okay.  Is there any suggestion that the
13   terms, any of the terms, of the prior independent contractor
14   agreement survived her change and her move in-house?
15             MR. BRENNAN:  She was still getting paid for the
16   business she brought in.  So, that to the extent it covered
17   those arrangements, yes, they did survive.
18             THE COURT:  At the risk of seeming obtuse, is it the
19   case, sir, that the independent contractor agreement persisted
20   but she individually had a different role at the company, such
21   that Cloud12 was getting 8500 whereas Pamela Johnston was
22   getting $3,000 per month?
23             MR. BRENNAN:  Your Honor, it is my understanding that
24   Cloud12 did continue to get paid the cash, 8500, the guarantee.
25   She got the 3,000, yes.

1     THE COURT:  I see.  If that's the case, how do I know
2  when she's acting in her Cloud12 capacity and how do I know
3  when she's acting as an employee of Electrum Partners?
4     MR. BRENNAN:  Well, I would look at it that the
5  fact -- the fact issue, first of all, it requires discovery --
6     THE COURT:  Okay.
7     MR. BRENNAN:  -- but I would look at it as, it was
8  merely a matter of convenience to continue paying Cloud12,
9  because that's the way Electrum had been doing it.  She got the
10 extra 3,000, also paid to Cloud12.  That's not in the Cloud12
11 agreement either.  However, she did get new title, new duties,
12 more intense duties.
13    THE COURT:  I'll certainly hear from Mr. Snyder in a
14 moment.  Your position is, because there was no written
15 memorialization of this new arrangement, her going in-house,
16 for lack of a better term, there was, for that reason, no
17 arbitration agreement to sign?
18    MR. BRENNAN:  That's correct, your Honor.  Oh, I
19 neglected to mention --
20    THE COURT:  Please.
21    MR. BRENNAN:  -- she also got -- Electrum and
22 Mr. Bocskor guaranteed her apartment rent of $6,000 a month as
23 part of the arrangement shifting over as an employee.
24    THE COURT:  For the entirety of her time there?
25    MR. BRENNAN:  They guaranteed it for, I believe, two

1     years, is the letter they signed.
2              THE COURT:  You'll excuse me if I note I'm in the
3     wrong profession, sir; no one is paying my apartment rent, and
4     I'm also not in a $6,000 a month apartment, but, okay, that's
5     as it may be.
6              How is your client now?
7              MR. BRENNAN:  She has gotten some favorable reports
8     recently on her health.  However, her treatments have been
9     coming up more regularly than they had been previously.  She's
10    in chemo treatment.  Like I said, she's gotten some favorable
11    reports; she's still quite ill.  And I think the doctors are
12    guardedly optimistic on her condition, which does not lead to a
13    conclusion, oh, you're cured.
14             THE COURT:  No, no.
15             MR. BRENNAN:  I think it's an extension of life at
16    this point.
17             THE COURT:  Of course.  But I am a human being before
18    I am a judge and I want to make sure she is well.  Okay.
19             Sir, I'm going to talk to your adversary in a moment,
20    but one of the reasons why I have premotion conferences is
21    because sometimes motions can be obviated by amended pleadings.
22    So I wanted to let you know, because at some point in this
23    conference I was going to let you know, that I would give you
24    the opportunity to replead if you'd like to do that, in order
25    to address, if you think it's worth addressing, some of the

1  statements or contentions made by your adversary.

2  After I hear from your adversary, I will ask you if
3  you want to avail yourself of that opportunity.  I just wanted
4  you to keep that in mind.

5  MR. BRENNAN:  Thank you, your Honor.  I appreciate it.

6  THE COURT:  Okay.  Thank you.

7  Mr. Snyder, let me talk to you, please, sir.  Do you
8  have a different understanding of the sequence of events of
9  Ms. Johnston's relationship, employment relationship, with
10 Electrum Partners?

11 MR. SNYDER:  Yes, your Honor, we do.

12 THE COURT:  Tell me, please, how you understand things
13 to have gone, sir.

14 MR. SNYDER:  We never understand Ms. Johnston to have
15 been an employee.  The agreement, which we attach to our
16 premotion letter, is an independent contractor agreement with a
17 two-year term, and it provides for $8,500 a month to be paid to
18 the consultant.  There is an equity incentive plan that if the
19 consultant avails herself of it, she could participate in.
20 Ms. Johnston did not do that.  She would be paid for expenses.
21 And there's also an exhibit to the agreement which provides
22 that she would receive some monies on what's referred to as
23 consultant contracts, contracts that she brought in.  But, to
24 the best of my knowledge, the scenario of June coming and
25 Ms. Johnston being treated as an employee with different

1    payment arrangements is not the case.
2             THE COURT:  To that end, sir, are you saying there was
3    not an additional $3,000 that made its way to her at some point
4    after the month of January 2016?
5             MR. SNYDER:  Your Honor, this is the first I'm hearing
6    of it.
7             THE COURT:  Okay.  How about the apartment?
8             MR. SNYDER:  I know that there was an apartment, and I
9    believe that actually goes to one of our arguments, that
10   basically Cloud12 and Ms. Johnston are one and the same, that
11   her office and her apartment were the same.  This is the first
12   I'm hearing there was any guarantee of the apartment.
13            THE COURT:  Maybe you want to check in with your
14   clients on those points.
15            MR. SNYDER:  Sure.
16            THE COURT:  So what you're saying is, having heard,
17   what Mr. Brennan has said to us, you simply disagree, and your
18   belief is that in a 12(b)(6) setting -- well, it would be a
19   motion to compel arbitration, would it not, sir?
20            MR. SNYDER:  It would be a motion to stay this
21   proceeding so we could arbitrate in Nevada.
22            THE COURT:  Right.  So we're not talking about whether
23   the clinics have been established or not; you're saying the
24   evidence that I may properly consider in connection with such a
25   motion would lead me to conclude inexorably that this had to be

1    arbitrated or at least the question of arbitrability is

2    something that was committed to the arbitrator and not to me?

3            MR. SNYDER:  Correct.

4            THE COURT:  Do you really have a problem with having

5    this case in federal court?  I'm just asking.

6            MR. SNYDER:  We don't think it belongs there.  We

7    think the parties agreed to arbitrate.  We believe there is a

8    presumption in favor of arbitrability.  It says any and all

9    disputes under case law in the Second Circuit.  Even if you're

10   not a signatory to an arbitration agreement, if you're the

11   alter ego of the company, you can be bound.  And we actually

12   did some research, in preparation for today, and Cloud12 is no

13   longer registered in New Jersey as a corporation.  It hasn't

14   filed the corporate formalities and filed annual reports over

15   the past two years.

16           The address and telephone numbers for both

17   Ms. Johnston and Cloud12 are identical.  She appears to be the

18   only employee.  So there is case law suggesting that she

19   exercises complete control over the LLC and she can be bound by

20   the arbitration provision.

21           THE COURT:  Well, let's put that to the side for the

22   moment and let's say it wasn't as clear that this was an alter

23   ego situation.  Are you saying, in the alternative, sir, that

24   it does not need to be an alter ego situation because here she

25   is the beneficiary of this contract, and if she's going to be

1   seeking back compensation or damages based on her employment
2   relationship, you're saying that employment relationship is
3   governed by the independent contractor or the independent
4   contractor contract and its attendant arbitration provision?
5           MR. SNYDER:  What I am saying is, there's also a
6   doctrine, the direct benefit estoppel doctrine.
7           THE COURT:  Yes.
8           MR. SNYDER:  And my understanding -- and I don't think
9   plaintiff's counsel has anything to the contrary -- is that any
10  monies were paid to Cloud12 pursuant to a 1099.  And
11  Ms. Johnston is the only employee and only shareholder with the
12  beneficiary of those payments.  Presumably, those payments went
13  to pay her salary, presumably those payments went to pay her
14  apartment slash office, perhaps other expenses.
15          So, we think the two are intertwined, and any claims
16  will be subject to arbitration under the arbitration provision.
17          THE COURT:  Anything else you'd like me to know, sir?
18          MR. SNYDER:  No, your Honor.
19          THE COURT:  Okay.  Thank you.
20          Mr. Brennan, do you want to say anything in reply?
21          MR. BRENNAN:  Two things briefly, your Honor.
22          The alter ego theory, the alter ego depends upon the
23  corporate form being used to defraud the victim or a victim.
24  None of that happened here.
25          In terms of your offer to replead, if I could ask your

1    Honor to indulge me with two days to look at the pleadings and
2    talk to my client?
3            THE COURT:  Absolutely.  And at that point, you'd let
4    me know if you wanted to replead?
5            MR. BRENNAN:  Absolutely, your Honor.
6            THE COURT:  That is fine.  We can absolutely do that.
7    And if you need more time, I understand the holiday season can
8    be a little bit hectic and your client, if I may be so candid,
9    has issues that I believe are more important than this
10   litigation.
11           MR. BRENNAN:  Oh, absolutely.  She certainly feels
12   that way.
13           And, actually, now that I opened my big mouth,
14   actually, next Tuesday would be better.
15           THE COURT:  Take the week, sir.  It's fine.
16           MR. BRENNAN:  All right.
17           THE COURT:  Let me know a week from today what your
18   pleasure is.  If I hear from you that you wish to amend, I'll
19   give you a reasonable amount of time to amend; and if you want
20   to specify what that is, you'll let me know.
21           Mr. Snyder, I believe that there is no way I'll be
22   talking you off the ledge of filing this motion.  You're going
23   to want to file it, yes, sir?
24           MR. SNYDER:  That's correct, your Honor.
25           THE COURT:  That is your prerogative, sir.  So what

1    I'll do is simply schedule it, either with one time frame if
2    there's going to be an amended pleading and with a different
3    time frame if there is not.
4             Arbitration, mediation:  Can this relationship be
5    saved?
6             MR. BRENNAN:  I don't know, your Honor.  I think
7    that's something Mr. Snyder and I could certainly discuss.
8             THE COURT:  I only know how much litigation costs.
9             MR. BRENNAN:  Yes.
10            THE COURT:  And your client, as I think we'd all
11   agree, has more important issues --
12            MR. BRENNAN:  Yes.
13            THE COURT:  -- than litigation, so I'm just asking,
14   given all the facts here.
15            Judge Fox is the magistrate judge assigned to this
16   case, and I can refer the case to him for settlement.  We have
17   a great court mediation program that you don't get charged for,
18   and I've used them to great success, if you want me to find you
19   a mediator who specializes in employment discrimination issues.
20   I can do settlement conferences, although sometimes folks don't
21   want me to if I'll preside over the trial -- I understand
22   people's views on that -- but I just want you to be aware, as
23   we embark on the costs of discovery and arbitration, whatnot,
24   you'll let me know if there's something short of that that can
25   be done because I'd be happy to help new that regard.

HCDKJOHC

1         Mr. Snyder, can I ask you, since you've given me more
2    substantive information, to arrange for a transcript of this
3    conference to be prepared, sir, in the ordinary course?
4         MR. SNYDER:  Definitely, your Honor.
5         THE COURT:  And if you do so, sir, I'll receive a copy
6    automatically, so you need not send it to me; I'll just know
7    that I can have it by the time of this motion, if a motion is
8    filed.
9         MR. SNYDER:  Thank you, Judge.
10        THE COURT:  Mr. Brennan, anything else this afternoon,
11   sir?
12        MR. BRENNAN:  No, your Honor.
13        THE COURT:  Thank you so much.
14        MR. BRENNAN:  Thank you.
15        THE COURT:  Mr. Snyder, anything else this afternoon?
16        MR. SNYDER:  No.  Thank you.
17        THE COURT:  Thank you, both, for coming in.
18        MR. BRENNAN:  Thank you, your Honor.
19                              * * *