UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __June 21, 2018__

PAMELA JOHNSTON,

                             Plaintiff,

                 v.

ELECTRUM PARTNERS LLC and LESLIE
BOCSKOR,

                        Defendants.

------------------------------------------------------- X

17 Civ. 7823 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge[1]:

In January 2016, Plaintiff Pamela Johnston ("Plaintiff" or "Johnston") entered into a working relationship with Defendant Electrum Partners LLC ("Electrum"). The nature and terms of that relationship may be open to dispute, but the parties agree that the relationship ended by August 2017. Two months later, in October 2017, Plaintiff brought the instant action claiming wrongful termination and retaliation under the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code §§ 8-101 to 8-131. Specifically, Plaintiff alleges that she was fired after reporting workplace misconduct to Electrum's management, including its founder, president, and managing member, Defendant Leslie Bocskor ("Bocskor," and together with Electrum, "Defendants"). In addition, Plaintiff claims that she was terminated after, and

---

[1] Holly Clancy, a rising second-year student at the University of Michigan School of Law and an intern in my Chambers, provided substantial assistance in researching and drafting this Opinion.

as a result of, advising Electrum that she had been diagnosed with an advanced form of cancer.

Defendants have moved to dismiss the complaint or to stay the case pending arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16. For the reasons set forth in the remainder of this Opinion, the Court will stay this litigation pending the results of an existing arbitration proceeding in Nevada.

## BACKGROUND[2]

### A. Factual Background

#### 1. The Parties

Plaintiff is a public relations specialist who resides at and works from a Manhattan address. (Compl. ¶¶ 2, 5). In furtherance of this business, Johnston served as President and sole owner of Cloud 12 Group, Inc. ("Cloud 12"), a corporation of which she is also the sole shareholder and principal. (*See* Bocskor Decl. ¶ 10; Pl. Opp. 8 (describing Cloud 12 as an "entity that

---

[2] For ease of reference, the Court refers to Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Action, or, Alternatively, Stay the Action Pending Arbitration as "Def. Br." (Dkt. #22); Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss or in the Alternative Stay Arbitration as "Pl. Opp." (Dkt. #20); Defendants' Reply Memorandum of Law in Support of Their Motion to Dismiss the Action, or, Alternatively, Stay the Action Pending Arbitration as "Def. Reply" (Dkt. #19); it refers to the transcript of the December 13, 2017 initial pretrial conference as "IPTC Tr." (Dkt. #12). In addition, this Opinion draws facts from the Complaint ("Compl." (Dkt. #1)), as well as the exhibits Defendants have submitted in support of their motion, including Defendant Leslie Bocskor's Declaration in support of Defendants' motion ("Bocskor Decl." (Def. Br., Ex. A (Dkt. #22-1))); the Independent Contractor Agreement ("ICA" (Def. Br., Ex. B (Dkt. #22-2))); the Demand for Arbitration and attached Complaint, to which the Court provides citations according to the paragraph numbers in that document ("Arb. Demand" (Def. Br., Ex. C (Dkt. #22-3))); the New Jersey Business Gateway Status Report for Cloud 12 Group Inc. ("N.J. Report" (Def. Br., Ex. D (Dkt. #22-4))); and a copy of Plaintiff's driver's license ("Pl. Driver's License" (Def. Br., Ex. G (Dkt. #22-7))).

[Plaintiff] controlled"); ICA 7 (indicating Johnston signed as President of Cloud 12)).[3]

Electrum began operations on or about January 6, 2014; Bocskor founded the company, and he continues to act as its president and managing member. (Bocskor Decl. ¶ 4). The company is incorporated in Nevada, and operates out of Las Vegas. (*See id.* at ¶¶ 3, 5). Electrum "provides advisory services and guidance to individuals and businesses engaged in the medical and recreational cannabis industries." (*Id.* at ¶ 6).

### 2. The Independent Contractor Agreement

On January 4, 2016, Cloud 12 and Electrum entered into an Independent Contractor Agreement (the "ICA" or "Agreement"). (ICA; *see also* Pl. Opp. 8). Johnston signed the ICA on behalf of Cloud 12 in her capacity as President, while Bocskor signed the ICA on behalf of Electrum in his capacity as Managing Member. (*Id.* at 7). Per the terms of the ICA, Cloud 12 was to serve as Electrum's Director of Marketing until December 31, 2018, at which point the ICA would terminate. (*Id.* at 2, 8). Either party could also terminate the Agreement before that time "for any or no reason" upon 60 days' notice.

---

[3] The parties dispute the status of Cloud 12's incorporation. Plaintiff contends that "Cloud 12 is organized under the laws of the State of New York, having moved there when Ms. Johnston relocated to New York." (Pl. Opp. 11 n.4). Conversely, Defendants point to Cloud 12's New Jersey Business Gateway Status Report, along with a printout of Cloud 12's New York State Division of Corporations Entity Information, which together indicate that Cloud 12's corporate status was revoked on August 16, 2017, for failure to file an "annual report for 2 consecutive years" (N.J. Report), and that Cloud 12 is not incorporated in New York but rather is registered as a "Foreign Business Corporation" (Def. Reply, Ex. H). *See also* N.Y. Bus. Corp. Law § 102(a)(7) (defining "Foreign corporation," in part, as "a corporation for profit formed under laws other than the statutes of this state"). This factual dispute is immaterial to the instant motion.

(*Id.* at 2).  Although the ICA allowed the parties to "mutually agree to amend, append or replace [the Agreement] with one another at any time," the Agreement could "not be modified, terminated, waived[,] altered or amended except in writing, signed by [Cloud 12] and a duly authorized officer of" Electrum.  (*Id.* at 2, 7).

The ICA specified the duties and responsibilities that Cloud 12 was to provide Electrum, including tasks involving "Communication Strategies," "Competitive Positioning," and "Executive Reputation."  (ICA 8).  Cloud 12 would also provide these services to entities beyond Electrum, including its subsidiaries, clients, and partners.  (*Id.*)  In exchange, Electrum would pay Cloud 12 "a fee of $8,500 per month," along with stock options.  (*Id.* at 1).  Bocskor contends, and nothing in the record contradicts, that (i) Johnston performed all of the work for Cloud 12 that was requested by Electrum, but (ii) all payments for Johnston's work under the ICA were made by Electrum to Cloud 12.  (Bocskor Decl. ¶¶ 16-17).

Bocskor further contends that Johnston negotiated the terms of the ICA with the express purpose of remaining an employee of only Cloud 12 and not Electrum, so that she could continue to "perform work for other clients through … Cloud 12, set her own schedule, and control the amount of personal income she received so as not to adversely affect the financial aid her daughter was receiving at college."  (Bocskor Decl. ¶ 12).  Johnston also understood that becoming an Electrum employee would require her to relocate to Nevada, a move that she did not wish to make.  (*Id.* at ¶ 13).  Johnston's bid for Cloud 12

to remain an independent contractor to Electrum is borne out by the terms of the ICA, which terms provide that Cloud 12 would perform services for Electrum "as an independent contractor," and that Cloud 12 was "not a partner, employee or agent of" Electrum. (ICA 2; *see also, e.g.*, *id.* at 1-2 (providing that Cloud 12 would be reimbursed for certain "pre-approved" expenses, but not any "equipment, tools, materials, and/or supplies to accomplish" the services it would provide to Electrum); *id.* at 2 (providing that Electrum would not withhold any taxes from its payments to Cloud 12, which was "solely responsible" for making tax payments)).

Crucial to the instant motion, the ICA included an arbitration provision, which stated, in relevant part:

> Except as otherwise provided in this Agreement, any and all controversies or claims arising out of or related to this Agreement or the breach thereof shall be settled by binding arbitration in Las Vegas, Nevada in accordance with the rules of the Judicial Arbitration and Mediation Service (JAMS), and judgment upon the award rendered may be entered in any court having jurisdiction. ... Nothing in this Paragraph shall prevent [Electrum] from seeking injunctive relief from the courts pending arbitration.

(ICA 7). Also relevant to the analysis below, the ICA contained a choice-of-law clause, providing that the "Agreement shall be construed in accordance with and governed by the substantive and procedural laws of the State of Nevada, regardless of its conflict of laws provision." (*Id.*).

### 3.     The Alleged Oral Agreement

Not until August 2017 did any party to the ICA seek in writing to modify or terminate the Agreement. Plaintiff alleges, nonetheless, that in June 2016,

she entered into an oral agreement with Electrum and Bocskor in her individual capacity to become Senior Vice President of Strategy and Special Projects for Electrum. (Compl. ¶¶ 20-21, 50). This, Plaintiff argues, made her an Electrum employee, rather than an independent contractor, and thus no longer subject to the ICA. (*See id.* at ¶ 22; Pl. Opp. 2). According to Plaintiff, she then "became more involved in the day-to-day operations of Electrum" and was given increased access to Electrum's financial and management information. (Pl. Opp. 2-3).

During a conference before the Court in anticipation of the instant motion, Plaintiff's counsel stated that when Plaintiff took on the new role at Electrum in June 2016, "she started getting an additional $3,000 a month." (IPTC Tr. 5:9-10). Plaintiff, however, has provided no documentary evidence of this pay increase, and Plaintiff's counsel admitted that no written documentation memorialized Plaintiff's new responsibilities or increase in pay. (*Id.* at 6:24-7:11). Plaintiff's counsel also admitted that as "a matter of convenience," Electrum continued to pay Cloud 12 for Johnston's services, rather than Johnston directly. (*Id.* at 7:18-8:12).

### 4. The Termination of the Relationship

The parties do not dispute that Plaintiff's working relationship with Electrum ended by August 2017. (Compl. ¶¶ 36-37; Bocskor Decl. ¶ 18). According to Johnston, this occurred after she reported several instances of inappropriate sexual behavior by Electrum employees to Bocskor and advised him that she had been diagnosed with stage four breast cancer. (Compl.

6

¶¶ 26-29).  Plaintiff claims that by July 2017, Defendants simply stopped paying her, and that she was fired when she "expressed alarm" at this development.  (*Id.* at ¶¶ 36-37).

In contrast, Defendants contend that "[o]n August 5, 2017, following numerous incidents involving Ms. Johnston and Cloud 12, Electrum provided written notice to Cloud 12, via Ms. Johnston, that the ICA would terminate" in 60 days.  (Bocskor Decl. ¶ 18).  According to a Demand for Arbitration that Electrum filed in Nevada, the "incidents" alleged against Johnston include engaging in unprofessional conduct that cost Electrum money and clients; subcontracting work to third parties and surreptitiously billing Electrum for those subcontracts in violation of the ICA; and disclosing confidential information to third parties in violation of the ICA.  (*See generally* Arb. Demand ¶¶ 23-43).[4]  By Defendants' account, 20 days after notifying Cloud 12 that Electrum would terminate the ICA, Cloud 12 ceased performing under the Agreement.  (Bocskor Decl. ¶ 19).

## B.  Procedural Background

Plaintiff filed the Complaint in this action on October 11, 2017, bringing claims for wrongful termination, aiding and abetting wrongful termination,

---

[4]    The Arbitration Demand indicates that Defendants filed it in Nevada on or around November 3, 2017.  (Arb. Demand 4).  Defendants represent that in December 2017, they initiated a parallel proceeding in the United States District Court for the District of Nevada to compel Plaintiff to submit to arbitration for "for claims that Defendants have against her and her company, Cloud 12."  (*See* Def. Reply 8).  Defendants represent further, that "[s]hould this Court grant Defendants instant Motion to Dismiss or Stay, Defendants will move the District of Nevada for an order compelling Plaintiff to arbitrate her claims asserted in this case against Defendants," and that Defendants have notified the Nevada court that the instant motion is pending.  (*Id.*).

unlawful retaliation, and aiding and abetting unlawful retaliation under NYCHRL. (Dkt. #1; Compl. ¶¶ 45-64).[5] On November 6, 2017, Defendants filed a letter with this Court requesting a pre-motion conference to address their anticipated motion to dismiss the action, or in the alternative, to stay it pending arbitration. (Dkt. #5). Plaintiff filed a responsive letter on November 9, 2017 (Dkt. #6), and the Court held the conference on December 13, 2017 (Dkt. #12). In response to an inquiry from the Court during the conference, Plaintiff later wrote to the Court to indicate that she did not intend to amend her complaint (Dkt. #10), and the Court therefore set a briefing schedule for the instant motion (Dkt. #11). On February 16, 2018, Defendants filed their motion to dismiss, or alternatively, to stay the action pending arbitration. (Dkt. #14-15). Plaintiff opposed the motion on March 20, 2018 (Dkt. #16), and Defendants replied to Plaintiff's opposition on April 3, 2018 (Dkt. #19).[6]

---

[5]    Although the Complaint alleges violations of the NYCHRL, it does not specify which sections of that statute provide the bases for Plaintiff's claims.

[6]    On April 17, 2018, Plaintiff requested a second pre-motion conference regarding an anticipated motion to seek expedited discovery. (Dkt. #21). Due to Johnston's cancer diagnosis, her counsel sought to have her deposed in order to preserve her testimony for a future trial or arbitral proceeding. (*Id.*) Defendants filed a letter opposing the request on April 20, 2018, which also noted this Court's individual rule requiring parties to meet and confer before bringing a discovery dispute to the Court. (Dkt. #23). Accordingly, on April 23, 2018, the Court directed the parties to meet and confer on the issue of expedited discovery. (Dkt. #24). Following this directive, the parties proposed a schedule for expedited discovery (Dkt. #27), which the Court endorsed on May 16, 2018 (Dkt. #28). The Court also issued a Stipulation and Order on that date reflecting the same. (Dkt. #29).

**DISCUSSION**

**A.    Applicable Law**

**1.    Motions to Stay Litigation Under § 3 of the FAA**

The FAA represents a "liberal federal policy favoring arbitration agreements[.]" *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone Mem'l Hosp.* v. *Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  Accordingly, "where the contract contains an arbitration clause," the obligation to arbitrate a dispute "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage." *AT&T Techs., Inc.* v. *Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of Am.* v. *Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).

Pursuant to § 3 of the FAA, where a district court determines that a suit is referable to arbitration under an arbitration agreement, the court "*shall* on application of one of the parties stay the trial of the action until such arbitration has been had[.]"  9 U.S.C. § 3 (emphasis added).  Stated more particularly, the Court "*must* stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *WorldCrisa Corp.* v. *Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) (emphasis added) (quoting *McMahan Sec. Co. L.P.* v. *Forum Capital Markets L.P.*, 35 F.3d 82, 85 (2d Cir. 1994)).  The inquiry into whether such a stay is appropriate requires the Court to consider:

9

> [i] whether the parties agreed to arbitrate; [ii] the scope of that agreement; [iii] if federal statutory claims are asserted, … whether Congress intended those claims to be nonarbitrable; and [iv] if … some, but not all, of the claims in the case are arbitrable, … whether to stay the balance of the proceedings pending arbitration.

*Oldroyd* v. *Elmira Sav. Bank, FSB*, 134 F.3d 72, 75-76 (2d Cir. 1998) (citing *Genesco, Inc.* v. *T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987), *abrogated on other grounds by Katz* v. *Cellco P'ship*, 794 F.3d 341 (2d Cir. 2015).  Because Plaintiff does not allege any federal claims and, as discussed below, does not allege any claims that are not arbitrable, only the first two factors are discussed in this Opinion.

### 2.      Standard Applicable to Motions Under § 3 of the FAA[7]

A court reviewing a motion to stay litigation pending arbitration applies a summary judgment standard.  *See Scott* v. *JPMorgan Chase & Co.*, No. 13 Civ. 646 (KPF), 2014 WL 338753, at *7 (S.D.N.Y. Jan. 30, 2014), *aff'd*, 603 F. App'x 33 (2d Cir. 2015) (summary order); *Stewart* v. *Paul, Hastings, Janofsky & Walker, LLP*, 201 F. Supp. 2d 291, 291 n.1 (S.D.N.Y. 2002).  Courts must therefore "consider all relevant, admissible evidence submitted by the parties" and "draw all reasonable inferences in favor of the non-moving party."  *Id.* (citations omitted).  "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary."  *Bensadoun* v. *Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (citing 9 U.S.C. § 4).

---

[7]      Defendants disclaim any intention to move this Court to compel arbitration, as they have already initiated an action in the District of Nevada to seek such relief.  (*See* Def. Reply 8).

Of note, in this context, "it is proper (and in fact necessary) to consider extrinsic evidence … , and if the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Fleming* v. *Crew*, No. 16 Civ. 2663 (GHW), 2016 WL 6208570, at *2 (S.D.N.Y. Oct. 21, 2016) (internal quotation marks, citations, and alterations omitted) (quoting *Oppenheimer & Co.* v. *Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995); *BS Sun Shipping Monrovia* v. *Citgo Petroleum Corp.*, No. 06 Civ. 839 (HB), 2006 WL 2265041, at *3 n.6 (S.D.N.Y. Aug. 8, 2006)).  As this Court has noted, once the party seeking a stay of judicial proceedings has proven that a valid arbitration agreement was made, the party opposing the stay "generally bears the burden of showing the agreement to be inapplicable or invalid." *Scott*, 2014 WL 338753, at *7 (quoting *Harrington* v. *Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010)).

### 3.    Choice of Law

The ICA contains a choice-of-law clause stating that the "Agreement shall be construed in accordance with and governed by the substantive and procedural laws of the State of Nevada, regardless of its conflict of laws provision."  Thus, at the outset, the Court must determine whether to look to state or federal law to resolve the instant motion.

"[T]he Supreme Court has held that the FAA creates a 'body of federal substantive law of arbitrability,'" and thus, "even the inclusion in the contract of a general choice-of-law clause does not require application of state law to

arbitrability issues[.]" *Doctor's Assocs., Inc.* v. *Distajo*, 107 F.3d 126, 130-31 (2d Cir. 1997) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24). Such arbitrability issues encompass those that would impact the "allocation of power between courts and arbitrators." *Nat'l Union Fire Ins Co. of Pittsburgh, Pa.* v. *Belco Petroleum Corp.*, 88 F.3d 129, 88 F.3d 129, 135 (2d Cir. 1996) (quoting *Mastrobuono* v. *Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 60 (1995)); *see also Holzer* v. *Mondadori*, No. 12 Civ. 5234 (NRB), 2013 WL 1104269, at *11 (S.D.N.Y. Mar. 14, 2013). These issues include, for instance, "the scope of issues to be arbitrated[.]" *Holzer*, 2013 WL 1104269, at *11.

Yet, as another court within this District explained, while courts should apply federal law to arbitrability issues "specifically directed at arbitration proceedings," where the issue is "one of general applicability to contracts," such as "whether a third party is bound by a contract," courts should "honor the [body of law selected by a] choice-of-law clause[.]" *FR 8 Singapore Pte. Ltd.* v. *Albacore Maritime Inc.*, 794 F. Supp. 2d 449, 454 (S.D.N.Y. 2011). Indeed, as the Supreme Court has made clear, "[n]either [§ 2 nor § 3 of the FAA] purports to alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)," and thus, "a litigant who was not a party to the relevant arbitration agreement may invoke § 3 if the relevant state contract law allows him to enforce the agreement." *Arthur Andersen LLP* v. *Carlisle*, 556 U.S. 624, 630-31 (2009). Courts within this Circuit have thus applied state-law principles to determine whether an arbitration agreement may bind, or be enforced by, nonparties. *See, e.g.,*

*Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39, 50-51 (2d Cir. 2004) (applying Swiss law per choice-of-law clause to determine whether nonsignatory could compel signatory to arbitrate); *Ramasamy* v. *Essar Global Ltd.*, 825 F. Supp. 2d 466, 469 (S.D.N.Y. 2011) (applying Texas law per choice-of-law clause to determine whether nonsignatory could compel signatory to arbitrate); *FR 8 Singapore*, 794 F. Supp. 2d at 454-59 (applying English law per choice-of-law clause to determine whether signatory could compel nonsignatory to arbitrate under alter ego theory).

Because the resolution of Defendants' motion requires the Court to determine whether Plaintiff is bound by the ICA's arbitration agreement, the Court will apply Nevada law to decide this issue, per the choice-of-law provision within the ICA.  The Court will apply federal law, however, to determine whether Plaintiff's claims fall within the scope of the arbitration agreement. *See Progressive Cas. Ins. Co.* v. *C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 48 (2d Cir. 1993) ("The issue of an arbitration agreement's scope is governed by the 'federal substantive law of arbitrability[.]'" (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 626)).

**B.    Plaintiff's Claims Are Arbitrable**

Although Plaintiff signed the ICA in her capacity as President of Cloud 12 rather than her personal capacity, Defendants contend that she is nonetheless bound by its arbitration provision.  Plaintiff counters, in the first instance, that her claims relate to a separate oral agreement, and in the second instance, that she is not personally bound by the ICA's arbitration provision.  Plaintiff's

13

arguments are unpersuasive: She agreed to arbitrate under the terms of the ICA, and the scope of the ICA's arbitration provision is sufficiently broad to encompass the claims she now brings.

### 1. The Parties Agreed to Arbitrate

#### a. Plaintiff Fails to Create a Triable Issue of Fact as to Whether the Parties Entered into a Separate Oral Agreement

Plaintiff's principal ground for opposing Defendants' motion for a stay provides "that the [Complaint] alleges a wholly separate and independent oral contract of employment [and the] parties did not agree to arbitrate issues arising under that contract." (Pl. Opp. 1). Yet in the face of the clear language of the ICA, submitted by Defendants in connection with this motion, Plaintiff has not provided so much as an affidavit to support her position. Plaintiff has thus failed to satisfy her burden to "submit evidentiary facts showing that there is a dispute of fact to be tried." *Oppenheimer*, 56 F.3d at 358.

Plaintiff relies solely on her pleading in asserting that the Court should conduct a trial to determine the existence *vel non* of the subsequent oral agreement. (*See* Pl. Opp. 2-6 (describing factual history as presented in Complaint)). This is a far cry from the evidentiary submissions that the Second Circuit has required to establish a triable issue of fact. *See, e.g., Filho* v. *Safra Nat'l Bank of N.Y.*, 489 F. App'x 483, 485-86 (2d Cir. 2012) (summary order) (finding triable issue of fact as to whether plaintiff entered into arbitration agreement based on plaintiff's affidavit and defendant's failure to establish that it delivered agreement to plaintiff); *Interbras Cayman Co.* v. *Orient Victory*

*Shipping Co., S.A.*, 663 F.2d 4, 6-7 (2d Cir. 1981) (per curiam) (holding that affidavits sufficed to raise genuine issue of fact on whether party entered arbitration agreement); *Interocean Shipping Co.* v. *Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972) (concluding that answer denying existence of arbitration agreement, supported by affidavits and exhibits, sufficed to warrant trial on making arbitration agreement). There is, therefore, no triable issue concerning the existence of an agreement separate and apart from the ICA.

### b. Plaintiff Is Bound by the ICA

The Court next considers Plaintiff's obligations under the ICA. Because Plaintiff signed the ICA in her capacity as President of Cloud 12, she argues that the claims she now brings are in her individual capacity and not subject to the arbitration provision of the ICA. *See generally Matter of Estate of Kern*, 107 Nev. 988, 991-92 (1991) (discussing personal liability for contracts signed in corporate as opposed to personal capacity). Defendants advance three theories to rebut this argument, arguing that Plaintiff is bound to the agreement under theories of agency, estoppel, and alter ego.

In analyzing these theories under Nevada law, the Court is guided by the decision in *Truck Insurance Exchange* v. *Palmer J. Swanson, Inc.* ("*Swanson*"), 124 Nev. 629 (2008). There, the Supreme Court of Nevada recognized that "nonsignatories to arbitration agreements" may be "required to arbitrate under theories of incorporation by reference, assumption, agency, alter ego, and estoppel." *Id.* at 631. And indeed, in opposing Defendants' proffered grounds

for binding her to the terms of the ICA, Plaintiff relies solely on a factual comparison to *Swanson*. As discussed below, Plaintiff's reliance is misplaced.

In *Swanson*, an insurance company had entered into several agreements with a California law firm "for the performance of legal services in California, all containing mandatory arbitration provisions." 124 Nev. at 631. The insurance company later proposed an expansion of these services into Nevada, and a 50% owner of the California firm agreed to undertake the expansion by forming a separate Nevada law firm, of which he would be the sole owner. *Id.* at 632. The owner agreed with the insurance company to an hourly rate identical to that charged by the California firm, but this agreement was never reduced to writing. *Id.*

After billing disputes arose between the insurance company and both the California and Nevada firms, the Nevada firm filed suit. 124 Nev. at 632. The insurance company moved to compel arbitration based on the arbitration clause in its agreements with the California firm, arguing that "the Nevada firms are one and the same." *Id.* The Supreme Court of Nevada rejected the insurance company's arguments based on theories of estoppel, alter ego, and unclean hands, instead holding that "the evidence in the record was not sufficient to compel the Nevada firm to participate in arbitration as a nonsignatory[.]" *Id.* at 638. The instant case has meaningfully different facts.

### i. Agency

Defendants argue first that Johnston's "status as President of Cloud 12 subjects her to the purview of the ICA's arbitration clause." (Def. Br. 8).

Plaintiff retorts that she is not a signatory to the ICA and does not seek to bring her claims under that agreement, and that the authorities on which Defendants rely are therefore inapposite. (Pl. Opp. 12-13). Johnston does not, however, dispute that she is an officer, and seemingly the sole officer, of Cloud 12. (Pl. Opp. 8 ("Johnston does not deny that Electrum and Cloud 12, an entity that she controlled, entered into the ICA on January 4, 2016."); *see also* ICA 7 (showing Johnston's signature as the President of Cloud 12)).

As the Supreme Court of Nevada has articulated, "[a] nonsignatory 'may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency.'" *Swanson*, 124 Nev. at 634 (quoting *Thomson-CSF. S.A.* v. *Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)). "An agency relationship results when one person possesses the contractual right to control another's manner of performing the duties for which he or she was hired." *Hamm* v. *Arrowcreek Homeowners' Ass'n*, 124 Nev. 290, 299 (2008). The Nevada Supreme Court has recognized that where, as here, a "non-signatory party is an employee of the signatory corporation" and the underlying dispute involves that relationship, "there is a uniform federal rule, founded on general state law principles of agency: [if] a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements." *Tallman* v. *Eighth Jud. Dist. Ct.*, 131 Nev. Adv. Op. 71 (2015) (en banc) (internal quotation marks and citation omitted) (denying writ of mandamus directing district court to vacate orders

compelling arbitration of employees' claims against former employer and its associates).

That same principle holds here. Because Johnston signed the ICA as Cloud 12's President and Bocskor signed as Electrum's Managing Member, both individuals signed as representatives of their respective corporations and may be bound to its terms. Plaintiff does not deny that she thereafter performed work for Electrum on Cloud 12's behalf under the contract. And Plaintiff's current claims are inextricably bound up in that relationship. Indeed, the ICA is the only agreement between the parties substantiated by the record. Binding Johnston to the ICA, including its arbitration provision, thus accords with traditional principles of agency law. *See Roby* v. *Corp. of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir. 1993) ("Courts in this and other circuits consistently have held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement." (collecting cases)).

### ii. Estoppel

Next, Defendants contend that under an estoppel theory, Johnston should not be able to avoid the arbitration provision of the Agreement, as she "directly benefited from the ICA." (Def. Br. 10). While Plaintiff argues that any direct benefit Johnston received derived from the alleged oral agreement rather than the ICA (Pl. Opp. 12), the Court has already rejected that argument. What is more, Plaintiff cannot deny that she directly benefited from the ICA.

"Under a theory of estoppel, '[a] nonsignatory is estopped from refusing to comply with an arbitration clause when it receives a 'direct benefit' from a contract containing an arbitration clause.'" *Swanson*, 124 Nev. at 636 (alteration in original) (quoting *Int'l Paper* v. *Schwabedissen Maschinen & Anlagen*, 206 F.3d 411, 418 (4th Cir. 2000)). Under this theory, "*nonsignatories* have been held to arbitration clauses where the nonsignatory 'knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement.'" *Comer* v. *Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (alternation in original) (quoting *E.I. DuPont de Nemours & Co.* v. *Rhone Poulenc Fiber & Resin Intermediates*, 269 F.3d 187, 199 (3d Cir. 2001)); *accord MAG Portfolio Consultant, GMBH* v. *Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001). Such knowing exploitation of an agreement includes "enforce[ment of] the terms" or "otherwise [ ] tak[ing] advantage of them." *Comer*, 436 F.3d at 1102.

The record confirms that Cloud 12 — of which Plaintiff was the sole and controlling member — received payment for Plaintiff's services from Electrum, which it would then distribute to Plaintiff.[8] Moreover, Plaintiff does not dispute Bocskor's contention that she negotiated the terms of the ICA to benefit her personally. (*See* Bocskor Decl. ¶¶ 12 ("[S]he did not want to be an employee

---

[8] Though Plaintiff's Complaint makes no mention of the ICA or a relationship between her and Electrum prior to June 2016, at the conference before this Court preceding the instant motion her counsel stated that "[t]here was a prior independent contractor relationship, not with Ms. Johnston, with a company that she operated" and that several aspects of her compensation remained consistent before and after June of 2016. (IPTC Tr. 2:22-24, 3:23-5:12).

because she wanted to be able to . . . control the amount of personal income she received so as not to adversely affect the financial aid her daughter was receiving at college."), 13 (providing that Plaintiff "did not want to move to Las Vegas," which would have been required had she been an employee of Electrum)).

To be sure, Plaintiff has specifically eschewed claims for breach of contract under the ICA. *Cf. Lennar Reno, LLC* v. *Macedo*, No. 65510, 2015 WL 7432106, at *2 (Nev. Nov. 18, 2015) (unpublished disposition) (finding nonsignatory obtained direct benefit from contract containing arbitration clause where claim was predicated on that contract). As noted, however, she has produced zero evidence substantiating a second oral agreement. As such, the Court may only interpret Plaintiff's claims as arising from the relationship with Electrum and Bocskor that was memorialized in the ICA. *Cf. Swanson*, 124 Nev. at 637 (holding that nonsignatory directly benefited from separate agreement with signatory rather than written agreement containing arbitration clause). That relationship produced direct economic and personal benefits to Plaintiff, and she is therefore estopped from denying her obligation to arbitrate disputes within the scope of the ICA.

### iii.   Alter Ego

Finally, Defendants argue that Johnston is bound to the terms of the ICA on an alter ego theory. (Def. Br. 10-12). To be bound to an arbitration provision under such a theory, the following circumstances must hold:

> [i] The corporation must be influenced and governed by the person asserted to be its alter ego[;] [ii] [t]here must

be such unity of interest and ownership that one is inseparable from the other; and [iii] [t]he facts must be such that adherence to the fiction of [a] separate entity would, under the circumstances sanction a fraud or promote injustice.

*Ecklund* v. *Nev. Wholesale Lumber Co.*, 93 Nev. 196, 197 (1977) (quoting *McCleary Cattle Co.* v. *Sewell*, 73 Nev. 279, 282 (1957)). The record here establishes each of the three elements.

*First*, Plaintiff does not deny that she was the sole member and President of Cloud 12, "an entity that she controlled[.]" (Pl. Opp. 8). Nevada courts have found such influence over a company sufficient to satisfy the first prong of the alter ego analysis. *See, e.g.*, *Mosa* v. *Wilson-Bates Furniture Co.*, 94 Nev. 521, 523 (1978) (finding sufficient influence over company where individual "was the sole investing and directing force"); *Carson Meadows Inc.* v. *Pease*, 91 Nev. 187, 191 (1975) (finding sufficient influence over company where "as president [individual] governed the corporate enterprise"); *Caple* v. *Raynel Campers, Inc.*, 90 Nev. 341, 343-44 (1974) (finding sufficient influence over company where individual was "sole investor and stockholder[ and] the only person with direction and control"), *abrogated on other grounds by Ace Truck & Equip. Rentals, Inc.* v. *Kahn*, 103 Nev. 503 (1987). Despite Plaintiff's contestations to the contrary, given her complete ownership of and control over Cloud 12, this case is readily distinguishable from *Swanson*, where the nonsignatory seeking to avoid arbitration was a mere 50% owner of the firm that signed the arbitration provision. 124 Nev. at 636.

*Second*, for similar reasons, Plaintiff has such a "unity of interests" with Cloud 12 that she is "inseparable" from the company.  *Ecklund*, 93 Nev. at 197. In making such a determination, Nevada courts consider "factors like co-mingling of funds, undercapitalization, unauthorized diversion of funds, treatment of corporate assets as the individual's own, and failure to observe corporate formalities." *Polaris Indus. Corp.* v. *Kaplan*, 103 Nev. 598, 601 (1987) (citing *N. Arlington Med. Building, Inc.* v. *Sanchez Constr. Co.*, 86 Nev. 515, 522 n. 8 (1970)).  Defendants point out that documents from the State of New Jersey suggest that as of November 17, 2017, Cloud 12 had failed to file an annual corporate report for two consecutive years, resulting in the revocation of its charter on August 16, 2017.  (*See* N.J. Report).[9]  Defendants have also produced a copy of Plaintiff's driver's license, which bears the same address as Cloud 12's address of record.  (*Compare id.*, *with* Pl. Driver's License).  And Plaintiff's own pleading confirms that she continues to "liv[e] at and work[] out of" the same address.  (Compl. ¶ 5).

Plaintiff does not dispute the accuracy of these records, which together suggest a disregard of corporate formalities.  *See Caple*, 90 Nev. at 344 (finding unity of interest where "corporation had no apparent independent business operation and existed solely for the purpose of conducting [individual's] personal business"); *Fusion Capital Fund II, LLC* v. *Ham*, 614 F.3d 698, 701 (7th Cir. 2010) (applying Nevada law and finding unity of interest where

---

[9]     That two-year period includes the date of the ICA's execution, on January 4, 2016.

corporation did not maintain necessary corporate documentation and was headquartered in members' residence); *cf. JSA, LLC* v. *Golden Gaming, Inc.*, No. 58074, 2013 WL 5437333, at *6 (Nev. Sept. 25, 2013) (unpublished disposition) (finding observance of corporate formalities where corporation undertook all steps required of a limited liability company under state law).

*Third*, releasing Plaintiff from the arbitration provision in the ICA in these circumstances would "promote injustice." *Ecklund*, 93 Nev. at 197. This final element does not require proof of "actual fraud"; rather, "[i]t is enough if the recognition of the two entities as separate would result in an injustice." *Kaplan*, 103 Nev. at 601. Nor does this element require "that a corporation was set up as a sham at its inception." *Brown* v. *Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1243 (D. Nev. 2008) (construing Nevada law). Here, adhering to the corporate form would allow Plaintiff to subvert the ICA's arbitration provision, which sought to encompass "any and all controversies or claims arising out of or related to th[e] Agreement" (ICA 7), while at the same time allowing her to reap the benefits for which she had bargained as Cloud 12's principal. *See Brown*, 531 F. Supp. 2d at 1243 (holding that using corporate identity to "circumvent and defeat" contractual provisions constituted sufficient injustice to support alter-ego theory). Thus, Plaintiff is bound to the ICA, including its arbitration provision, under each of the three theories that Defendants advance.

## 2. Plaintiff's Claims Fall Within the Scope of the Arbitration Agreement

The Court now considers whether Plaintiff's claims fall within the scope of the ICA's arbitration provision, and to do this it applies federal law. *See Progressive Cas. Ins. Co.*, 991 F.2d at 48 ("[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 626)). In determining "whether a particular dispute falls within the scope of an agreement's arbitration clause," a court first determines whether the clause is broad or narrow. *Louis Dreyfus Negoce S.A.* v. *Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001). "Where the arbitration clause is broad, 'there arises a presumption of arbitrability[.]'" *Id.* at 224 (quoting *Collins & Aikman Prods. Co.* v. *Bldg. Sys., Inc.*, 58 F.3d 16, 23 (2d Cir. 1995)). This presumption may only be "overcome if 'it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,'" and any "[d]oubts should be resolved in favor of arbitration." *WorldCrisa Corp.* v. *Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) (quoting *Associated Brick Mason Contractors of Greater N.Y., Inc.* v. *Harrington*, 820 F.2d 31, 35 (2d Cir. 1987)).

The arbitration provision at issue here, which encompasses "any and all controversies or claims arising out of or relating to [the] Agreement" (ICA 7), is "classically broad." *Mehler* v. *Terminix Int'l Co. L.P.*, 205 F.3d 44, 49 (2d Cir. 2000) (describing as "classically broad" a clause providing arbitration for "any controversy or claim between [the parties] arising out of or relating to" the

contract (alteration in original)).  As such, the presumption in favor of arbitration applies, and Plaintiff has provided no alternative reading of the provision that would wrest her claims — which stem from her working relationship with a counterparty to the ICA and its founder and managing member — from its grasp.

That Plaintiff alleges wrongful discharge and unlawful retaliation rather than breach of the ICA is of no moment.  "In determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted." *Genesco, Inc.* v. *T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 846 (2d Cir. 1987).  Plaintiff's claims "relat[e] to" her relationship with Electrum and Bocskor, which by all accounts began with the ICA.  *See Oldroyd*, 134 F.3d at 74-77 (arbitration clause in employment contract applicable to "[a]ny dispute, controversy or claim arising or in connection with this Agreement" encompassed retaliatory discharge claim).  Her claims are thus within the scope of the ICA's arbitration provision.

### 3. The Arbitration Agreement Is Not Void Under Nevada Law

Arbitration provisions subject to the FAA "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Plaintiff argues that the arbitration provision within the ICA is unenforceable under Nevada law.  (Pl. Opp. 14-16). Specifically, Plaintiff points to Nevada Revised Statute § 597.995, which states that "an agreement which includes a provision which requires a person to

submit to arbitration any dispute arising between the parties to the agreement must include specific authorization for the provision which indicates that the person has affirmatively agreed to the provision."  Although Plaintiff does not state as much, the Court presumes that Plaintiff seeks to invalidate the arbitration clause because it is not accompanied by such a specific authorization.  Any such argument fails.

In *Doctor's Associates, Inc.* v. *Casarotto*, the Supreme Court explained that "[b]y enacting § 2" of the FAA, "Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.'"  517 U.S. 681, 687 (1996) (quoting *Scherk* v. *Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)).  The Court thus held that "[c]ourts may not . . . invalidate arbitration agreements under state laws applicable *only* to arbitration provisions."  *Id.*  Accordingly, the Court held that the FAA "displace[d]" a Montana statute that "directly conflict[ed]" with § 2 because it "condition[ed] the enforceability of arbitration agreements on compliance with a special notice requirement not applicable to contracts generally."  *Id.* (discussing Mont. Code Ann. § 27-5-114(4)).

The Nevada statute at issue similarly "conditions the enforceability of arbitration agreements on compliance with a special [authorization] requirement not applicable to contracts generally."  *Casarotto*, 517 U.S. at 687.  The Court therefore may not invalidate the arbitration provision at issue under Nevada Revised Statute § 597.995, as the FAA displaces the applicability of

that law to the ICA's provisions. Although the Nevada Supreme Court has not yet had the opportunity to consider whether the FAA displaces § 597.995, *see Fat Hat, LLC* v. *DiTerlizzi*, 385 P.3d 580 n.1 (Nev. 2016) (table opinion) (while construing § 597.995, noting that the court was not faced with a challenge to its applicability under *Casarotto*), one court within the District of Nevada has considered the issue and arrived at the same conclusion that the Court reaches today, *see JusTours, Inc.* v. *Bogenius Grp. LLC*, No. 17 Civ. 0078 (GMN) (CWH), 2017 WL 3671285, at *4 (D. Nev. Aug. 25, 2017) (refusing to invalidate arbitration provision under § 597.995 in light of *Casarotto*). Thus, Plaintiff's bid to invalidate the ICA's arbitration provision under § 597.995 fails.

## C.    **This Case Will Be Stayed**

Defendants urge this Court to dismiss this action pursuant to *Rubin* v. *Sona International Corp.*, and only in the alternative seek to stay the case. *See* 457 F. Supp. 2d 191, 198 (S.D.N.Y. 2006) ("Where all of the issues raised in the Complaint must be submitted to arbitration, the Court may dismiss an action rather than stay proceedings.") (cited in Def. Br. 12-13). This argument fails to acknowledge the Second Circuit's more recent precedent that "recognize[d] the impetus for a rule permitting dismissal," but "conclude[d] that the text, structure, and underlying policy of the FAA *mandate a stay of proceedings* when all of the claims in an action have been referred to arbitration and a stay requested." *Katz* v. *Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015) (emphasis added); *see e.g.*, *Virk* v. *Maple-Gate Anesthesiologists, P.C.*, 657 F. App'x 19, 20 (2d Cir. 2016) (summary order) (vacating district court's order granting motion

to compel arbitration and dismissing complaint where motion sought either stay or dismissal, and stating that "the district court lacked discretion to dismiss … under *Katz* as well as the plain language of 9 U.S.C. § 3"); *Abel* v. *All Green Bldg. Servs. of N.Y. LLC*, No. 16 Civ. 8522 (JPO), 2017 WL 5468764, at *2 (S.D.N.Y. Nov. 14, 2017) (finding claims arbitrable but denying motion to dismiss and staying litigation pending arbitration); *Consol. Precision Prods. Corp.* v. *Gen. Elec. Co.*, 15 Civ. 8721 (PKC), 2016 WL 2766662, at *7 (S.D.N.Y. May 12, 2016) ("The FAA's directive" as interpreted in *Katz* "that a court 'shall' stay the action pending arbitration limits a district court's inherent authority to manage its own docket.").

Accordingly, the Court denies Defendants' motion to dismiss and instead stays this action pending arbitration of the parties' claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's claims is DENIED, and Defendants' motion for a stay pending arbitration is GRANTED. The parties are ORDERED to provide joint status updates every 90 days from the date of this Opinion and Order regarding the parallel proceedings in the District of Nevada and any ensuing arbitration.

SO ORDERED.

Dated:     June 21, 2018
           New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge